UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

| | |
|---|---|
| WHITE STALLION ENERGY CENTER, LLC, DESERET POWER ELECTRIC COOPERATIVE, SUNFLOWER ELECTRIC POWER CORP., TRI-STATE GENERATION & TRANSMISSION ASSOCIATION, INC., TENASKA TRAILBLAZER PARTNERS, LLC and POWER4GEORGIANS, LLC, <br><br>      Petitioners, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br>      Respondent. | Docket Nos. 12-1100, 12-1176, 12-1177, 12-1178, 12-1180, 12-1184, and consolidated cases |

_____

**RESPONSE OF CALPINE CORPORATION, EXELON CORPORATION, NATIONAL GRID GENERATION LLC, AND PUBLIC SERVICE ENTERPRISE GROUP, INC., IN OPPOSITION TO JOINT MOTION BY DEVELOPERS OF NEW SOLID-FUELED ELECTRIC GENERATING UNITS TO SEVER AND EXPEDITE**

"Proposed Industry Intervenors"[1] oppose the motion by the "New-Unit Developers"[2] to sever and to expedite certain issues pertaining to their challenge to

---

[1]     Proposed Industry Intervenors are Calpine Corporation, Exelon Corporation, National Grid Generation LLC, and Public Service Enterprise Group, Inc.

the "National Emission Standards for Hazardous Air Pollutants From Coal and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units," 77 Fed. Reg. 9,304 (Feb. 16, 2012) ("MATS" or the "Rule"). The Court should deny the motion to sever and to expedite the two issues[3] that movants contend relate to new electric utility steam electric generating units ("EGUs" or "units") because these issues relate equally to existing units, and severance of these issues will prejudice other parties and squander, rather than preserve, the Court's resources. Existing EGUs subject to the rule outnumber new units proposed by movants by more than 200 to 1, and this lopsided relationship is reflected by the fact that only six of more than 70 petitioners seek this relief. Were the Court to grant the relief sought, all of the parties interested primarily in issues relating to existing units would be required to participate with respect to the severed and expedited issues in order to participate

---

(...continued)
[2]   Movants are petitioners White Stallion Energy Center, LLC, Sunflower Electric Power Corporation, Tri-State Generation and Transmission Association, Inc., Power4Georgians, LLC, Deseret Power Electric Cooperative, and Tenaska Trailblazer Partners.

[3]   By "Notice of Further Clarification and Modification of Relief Requested," (Doc. No. 1373043) ("Notice of Further Clarification") filed on May 9, movants withdrew their request regarding a third issue, relating to EPA's determination of subcategories.

meaningfully in the Court's consideration of those issues, and then to return to the "second phase" of the case, where they would litigate the remaining issues to be raised by petitioners. Further, as evidenced by movants' clarification and modification of the relief requested, the issues that movants seek to sever are inextricably intertwined with the remaining issues, introducing the potential for confusion. The dangers of redundancy, confusion, and prejudice require that the motion be denied. Moreover, movants fail to satisfy this Court's standards for expedition and therefore the motion must be denied.

A. **Severance of These Issues Would Be Prejudicial to Other Parties and Contrary to the Goal of Judicial Economy.**

Despite their burden to offer a compelling basis for the Court to sever issues, movants give the remedy of severance only passing reference on the way to their discussion of expedition. Movants neither cite authority applicable to their severance request, nor discuss the circumstances under which severance is appropriate. However, the issue of severance is central to the Court's consideration of the motion. Without severance, the motion is nothing more than a request to expedite briefing of the entire case for the convenience of a handful of parties. Such a motion would be opposed by petitioners and respondents alike, and indeed movants do *not* request expedition of the entire case, even as alternative relief. Therefore, unless movants demonstrate a compelling basis for severance, the motion must be denied.

No appellate or local rule expressly addresses severance of issues, although the Court certainly has intrinsic authority to manage the way in which parties present issues to the Court. Federal Rule of Civil Procedure 42(b) authorizes district courts to conduct "a separate trial of one or more *separate* issues" "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b) (emphasis added). Application of these criteria here would require that the motion be denied.

The issues identified by movants are not "separate" from the other issues in this appeal. The Clean Air Act requires that EPA establish limits on emissions of hazardous air pollutants ("HAPs") for categories of air pollution sources. 42 U.S.C. § 7412. The Rule establishes these limits for EGUs. The Act requires that these emission limits reflect "the maximum degree of reduction in emissions of the [HAPs] . . . that the Administrator . . . determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies. . . ." *Id.* § 7412(d)(2). The Act also requires that the standards for new units be no less stringent than "the emission control that is achieved in practice by the best controlled similar source," and that the standards for existing units be no less stringent than "the average emission limitation achieved by the best performing 12 percent of the existing sources" in the same source category or subcategory. *Id.* § 7412(d)(3).

The minimum standards that apply to *both* new and existing sources, then, depend on what it means to "achieve" an emission level, how EPA identifies the "best controlled" or "best performing" source or sources, and EPA's determination whether sources are sufficiently similar to group in the same subcategory. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 861-66 (D.C. Cir. 2001). These are precisely issues identified by movants.

Movants identify two issues—EPA's technique for accommodating variability and EPA's application of a pollutant-by-pollutant approach to determining emission standards. The "pollutant-by-pollutant approach" applied by EPA goes to the question of how the "best controlled" or "best performing" units are identified. The "variability" issue goes to the question of whether an existing unit "achieves" a standard, though movants now suggest that the "variability" issue extends to EPA's determination of whether two units are similar enough to be grouped in the same category for purposes of determining emission limits. Notice of Further Clarification, ¶ 10. Although movants purport to drop the subcategorization issue in their Notice of Further Clarification, they clearly intend to litigate EPA's subcategorization decision under the guise of challenging the "similarity" of the sources used by EPA to establish the new unit standards. *See* 76 Fed. Reg. 24,976, 25,047 (May 3, 2011); 77 Fed. Reg. at 9,387 (EPA's selection

process for setting new unit standards began with its subcategorization determinations).

The issues of variability, pollutant-by-pollutant methodology, and subcategorization relate equally to existing units. EPA used the same subcategories for both new and existing units, *see, e.g.*, 77 Fed. Reg. at 9,367-9,368, 9,378-9,379, applied the pollutant-by-pollutant approach to determine limits for both new and existing units, *see* 77 Fed. Reg. at 9,386-9,388, 9,390-9,391, and applied similar statistical methods to account for variability in setting limits for new and existing units, *see* Exh. J to Motion, Memorandum: "National Emission Standards for Hazardous Air Pollutants (NESHAP) Maximum Achievable Control Technology (MACT) Floor Analysis for Coal- and Oil-fired Electric Steam Generating Units for Final Rule" (Dec. 16, 2011) ("MACT Floor Memo") (pollutant-by-pollutant methodology and approach to considering variability similar for both new and existing unit MACT limits). There is not one set of criteria on which EPA based emission limits for new units, and an entirely different set of criteria on which EPA based emission limits for existing units. Accordingly, there is no way for the Court to separate the issues identified by movants to evaluate independently EPA's treatment of new units, and subsequently its treatment of existing units.

If the Court were to grant the relief requested, parties interested primarily in the Rule's application to existing units would be compelled to participate in the "new unit phase" of the case.[4] Otherwise, the Court's decision on the severed issues as they apply to new units could effectively decide, or at least could materially affect the Court's consideration of, those same issues as they apply to existing units, without the opportunity for further input. However, these two issues are but a few of a large number of issues likely to be raised in this proceeding,[5] and the resolution of these issues would not relieve the parties and the Court of the need to resolve the other issues likely to be raised. Even if the Court allowed for the determination of movants' issues as they pertain to *both* new and existing units,

---

[4] Indeed, several petitioners have already sought leave to participate in any severed phase in order to present their views to the Court. *See* "Response of the Utility Air Regulatory Group to the Joint Motion to Sever and Expedite Consideration of Certain New Unit Issues" (Doc. No. 1374277); "Oak Grove Management Company LLC's and Gulf Coast Lignite Coalition's Response to New Unit Developers' Motion to Sever and Expedite and Request to Participate in Briefing," (Doc. No. 1374288).

[5] Many other petitioners submitted comments on the proposed rule raising numerous issues, including those addressed by movants. For example, the Utility Air Regulatory Group ("UARG") alone submitted over 270 pages of comments on the rule and many volumes of supplemental material, and a 74 single-spaced page reconsideration petition. UARG also addressed the issues raised by movants with respect to new and existing sources. "Comment of the Utility Air Regulatory Group," at 80-86, 92-99 (Aug. 4, 2011) (EPA-HQ-OAR-2009-0234-17775).

the parties would nonetheless need to conduct a second phase to resolve the remaining issues.

Far from promoting judicial economy or avoiding prejudice, the proposal would squander the Court's resources and prejudice the vast majority of parties. While the proposal could conceivably expedite the resolution of the issues identified by movants, it would certainly *not* expedite the ultimate resolution of the case, encumbered as it would be by a two-phase process. Compared to the criteria in Fed. R. Civ. P. 42(b), movants' proposal fails to promote economy, avoid prejudice or expedite resolution, and serves the convenience only of the six movants, not that of the Court or the other 100 parties to this case. The motion must be denied.

**B.      Movants Have Not Demonstrated Irreparable Harm That Would Justify Expediting Their Appeals.**

Movants have not demonstrated that expedited consideration of the issues is necessary to avoid "irreparable injury" to their interests, or that expedited consideration will redress their alleged harm. Thus, the Court should deny the request to expedite. Expedited consideration is granted "very rarely." Handbook of Practice and Internal Procedures of the U.S. Court of Appeals for the D.C. Circuit, at 33 ("D.C. Cir. Handbook"). "The movant must demonstrate that the

delay will cause irreparable injury and that the decision under review is subject to substantial challenge." *Id.*[6] Movants have not met this standard.

### 1. Movants are not Irreparably Harmed by a *Proposed* Rule Subject to an Ongoing Process that Can Afford Them Relief.

Movants have not offered a compelling case that they will suffer irreparable harm if this case proceeds without expedition. Movants claim that their quandary is caused by the impact of the *proposed* greenhouse gas ("GHG") new source performance standards ("NSPS") for EGUs, *Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units*, 77 Fed. Reg. 22,392 (Apr. 13, 2012) ("GHG NSPS"). To the extent movants base their irreparable harm claims on the proposed GHG NSPS, the Court should disregard them entirely. The GHG NSPS is a proposed rule, likely to

---

[6] Movants assert that this standard is less stringent than a motion for a stay. Motion at 5. The case they cite for that proposition, *Chamber of Commerce v. SEC*, No. 04-1300, 2004 U.S. App. LEXIS 21685, *1 (D.C. Cir. Oct. 18, 2004), does not specifically state as much, and movants infer this proposition from the Court's decision not to stay but to expedite. A motion to expedite may be granted only where the delay "will cause irreparable injury," which suggests a showing of harm at least as, and perhaps more, certain than, the "likelihood" of irreparable injury necessary to warrant a stay or injunction. *See Winter v. Nat. Res. Def. Council*, 129 S. Ct. 365, 375 (2008); D.C. Cir. Handbook at 33 (providing that one factor in a motion for stay is "the *prospect* of irreparable injury to the moving party if relief is withheld" (emphasis added)).

provoke significant public comments.[7] Movants' remedy is to present their concerns about that *proposed* rule in comments, which EPA is required to consider.

The Clean Air Act provides that NSPS take effect upon the publication of the proposed rule, so that sources that begin construction after the date of the proposal must achieve the proposed standard. *See* 42 U.S.C. § 7411(a)(2). However, in the proposed GHG NSPS, EPA creates an exemption by defining a new category of "transitional sources" to which the NSPS will not apply: coal-fired power plants that have received a PSD preconstruction permit by April 13, 2012 and that commence construction within 12 months of that date. 77 Fed. Reg. at 22,421.[8] This exemption represents extraordinary relief, without which the proposed NSPS requirements would immediately apply to movants' projects. If movants have an issue with the 12-month window or with any other aspect of EPA's proposed treatment of transitional facilities, they have ample opportunity to

---

[7] Though this proposed rule was published on April 13, 2012, and set a 60 day comment period, *see* 77 Fed. Reg. at 22,392, since publication EPA already has extended the comment period by 13 days, until June 25, 2012, and has set two public hearings for May 24, 2012, *see* 77 Fed. Reg. 26,476 (May 4, 2012).

[8] EPA identified 15 proposed sources that might qualify as transitional, including movants' proposed new units, 77 Fed. Reg. at 22,422, and requested comment on whether others should be included.

comment on those matters in the GHG NSPS rulemaking process. Movants could, for example, comment that the transitional period should be extended.

In response, EPA could modify its proposed GHG NSPS by extending the period to begin construction. EPA also might elect to return to the drawing board and re-propose the GHG NSPS. *See, e.g.*, "National Emission Standards for Hazardous Air Pollutants; Notice of Reconsideration," 76 Fed. Reg. 15,266 (Mar. 21, 2011) (issuing notice of reconsideration of final rule the same day as publication of the final rule). Movants' injury is therefore entirely hypothetical. It is more appropriate for them to use the public comment process for the proposed rule of which they complain, than to ask this Court to expedite a complex case to avoid a hypothetical potential future injury to movants that will come to pass only if EPA's proposed rule is adopted as proposed and all of the other preconditions for movants' unlikely projects are satisfied.[9]

### 2. Movants' Proposed New Units Face Challenges Beyond Those They Attribute to MATS and the Proposed GHG NSPS.

Movants offer an overly simplistic view when they suggest that only MATS and the proposed GHG NSPS stand in the way of their proposed new EGUs. Project-specific challenges could inhibit their development. For example, a

---

[9] Since 2008, 15 proposed coal-fired plants with approved PSD permits have cancelled plans to construct, and since 2009, only one coal-fired plant has been built. 77 Fed. Reg. at 22,422 n.66.

challenge to Sunflower's preconstruction air quality permit is pending before the Kansas Supreme Court, and while Sunflower and Tri-State anticipate a successful outcome in early 2013, neither the outcome nor its timing can be certain. *See* Penrod Decl. (Exh. E to Motion) at ¶¶ 7-8; Anderson Decl. (Exh. F to Motion) at ¶ 7. The Sunflower project may require approvals or authorizations from the Rural Utilities Service that will require environmental review, including preparation of an environmental impact statement. *See Sierra Club v. United States Dep't of Agriculture, Rural Utilities Serv.*, No. 07-1860, 2012 U.S. Dist. LEXIS 10884 (D.D.C. Jan. 30, 2012); *Sierra Club v. United States Dep't of Agriculture, Rural Utilities Serv.*, 777 F. Supp. 2d 44 (D.D.C. 2011). Tenaska acknowledges that "certain challenges must be overcome" for its project to be a success, *see* Kunkel Decl. (Exh. G to Motion) at ¶ 10, challenges which presumably include development of the post-combustion $CO_2$ capture technology that is a critical aspect of its proposed new power plant.

Conditions in the energy markets also threaten the financing of the new units proposed by movants and their ability to commence construction. Natural gas prices have fallen rapidly since these units were first proposed, and these historically and sustainably low prices present a significant market barrier to development of new coal-fired EGUs. *See* U.S. Energy Information Admin., "Annual Energy Outlook 2012 Early Release Overview," ("AEO2012 Early

Release Outlook")[10] at 2, 10; *see also* U.S. Energy Information Admin., "Annual Energy Outlook 2011" (Apr. 2011)[11] at 73. These lower gas prices have led to lower wholesale electricity prices and have been coupled with an increase in coal prices due to greater production costs, as well as increased exports of coal to satisfy overseas demand, making the development of new coal-fired EGUs less plausible. *See* AEO2012 Early Release Outlook at 2, 5, 10; Matthew Brown, Associated Press, "Coal Exports Surge to Their Highest Level Since 1991."[12] The cost of generation from a new natural gas combined cycle plant is now expected to be less, on average, than the cost of generation from a new coal-fired EGU.[13] These conditions make movants' projects less attractive to lenders and investors even without considering air regulations. These deteriorating economic fundamentals pose a far more potent threat to movants' projects than MATS or the potential application of the proposed GHG NSPS. Thus, movants cannot

---

[10] *Available at* http://www.eia.gov/forecasts/aeo/er/pdf/0383er(2012).pdf.

[11] *Available at* http://www.eia.gov/forecasts/aeo/pdf/0383(2011).pdf.

[12] *Available at* http://news.yahoo.com/coal-exports-surge-highest-level-since-1991-145804090.html.

[13] Proposed GHG NSPS, 77 Fed. Reg. at 22,413 (citing "Levelized Cost of New Generation in the Annual Energy Outlook 2011, http://205.254.135.24/oaif/aeo/electricity_generation.html).

demonstrate that expediting these issues would in fact allow their projects to proceed.

### 3. The Motion is Tardy.

Movants' allegations of urgency are inconsistent with their tardiness in requesting expedition. Movant White Stallion filed its petition for review on February 16, 2012, but waited 70 days before filing this motion. While the other movants joined the case more recently, EPA released MATS on December 21, 2011, allowing plenty of time for challengers to file petitions upon the Rule's publication on February 16, as White Stallion did. Movants did not bring their "urgent" need for expedition to the Court's attention until April 27, more than four months after the Rule was released and more than two months after they could have moved for relief. Even the proposed GHG NSPS, upon which movants heavily rely, was released on March 27, 2012, a full month before movants filed this motion. These delays suggest movants' harm is neither imminent nor irreparable. *See Salazar v. District of Columbia*, 671 F.3d 1258, 1266 (D.C. Cir. 2012) (citations omitted); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months militates against a finding of irreparable harm).

## C. Movants Do Not Present Substantial Arguments on the Merits of the Issues They Seek to Expedite.

Movants seek to sever and to expedite their claims that EPA erred in establishing the *emission limits* applicable to new units. However, the supporting documents movants offer do not address the limits themselves, but rather the capabilities of certain monitoring equipment to *measure* emissions. *See* B&W Request (Exh. C to Motion) at 1; *see also*, ICAC Petition (Exh. B to Motion) at 2. Neither of the third parties cited by movants claims that the emission limits cannot be achieved. Rather, they claim that certain monitoring methods are not adequately sensitive.

For example, with respect to the mercury standard, movants offer a statement by Babcock & Wilcox that the emissions limit for new coal-fired plants is below the accuracy threshold of continuous emissions monitoring systems ("CEMS"), although Babcock & Wilcox correctly acknowledges that the Rule allows compliance to be shown by use of mercury sorbent trap systems. *See* B&W Request (Exh. C to Motion) at 3. *See also,* ICAC Petition (Exh. B to Motion) at 2 (alleging "inability of emission monitoring equipment to continuously monitor").[14]

---

[14] The Institute of Clean Air Companies' petition addresses mercury only and, while it raises a prospect that sorbent traps could be affected by "prolonged exposure," it is not clear that this prospect would prevent use of this compliance measurement mechanism, particularly since the regulations allow both a primary and a backup system that could be employed if the

(continued...)

However, movants do not seek to sever and expedite challenges to the *monitoring methods* that EPA specifies for new units. Rather, movants seek to challenge the emission limits and the way that EPA set them, and imply that emission limits must be set to accommodate the measurement requirements that lenders require to provide guarantees. Congress has specified that the emissions limit cannot be higher than "the emission control that is achieved in practice by the best controlled similar source." 42 U.S.C. § 7412(d)(3). Movants have not shown that the emission limits adopted by EPA do not reflect actual measurements of emissions control that have been achieved in practice or that there are no measurement techniques that could be used to measure compliance.

EPA based the emission limits on actual measurements of emissions that have been achieved in practice by existing units, and confirmed that all limits are

___

(...continued)
    primary system malfunctions. *See* 40 C.F.R. pt. 63, subpt. UUUUU, App. A, § 2.2, 77 Fed. Reg. at 9,499; ICAC Petition (Exh. B to Motion) at 6.

    The B&W Request also states that the HCl limits are below the accuracy of CEMS but acknowledges that the Rule permits HCl to be measured by using an alternative method. Indeed, the Rule permits HCl compliance at plants employing state of the art scrubbers to be demonstrated by measuring sulfur dioxide emissions (*see* 40 C.F.R. § 63.9991(c), 77 Fed Reg. at 9,465-6), and none of the statements suggest that the limits based on sulfur dioxide cannot be measured reliably in real time. With respect to particulate matter, the B&W Request indicates that the PM limit is "above, but close to, the analytical accuracy of a PM CEMS." B&W Request (Exh. C to Motion) at 3.

achieved by at least one plant, the Logan plant. 77 Fed. Reg. at 9,387; "EPA's Responses to Public Comments on EPA's National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units" Vol. 1 at 431-432, 451 (Dec. 2011) ("Response to Comments"); MACT Floor Memo (Exh. J to Motion) at 12-14. Movants' position would yield emission limits above those "achieved in practice," contravening the statutory directive that new unit limits be no less stringent than what the best controlled similar source achieves. *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.* 467 U.S. 837 (1984); *Cement Kiln Recycling Coal.*, 255 F.3d at 861 ("EPA may not deviate from [section 112(d)(3)'s] requirement that floors reflect what the best performers actually achieve").

Excluding movants' irrelevant complaints about monitoring, movants' claim that the MATS new source limits have not been achieved in practice simply reflects movants' disagreement with EPA's assessment of data. Movants challenge EPA's reliance upon a 99% upper prediction limit to estimate variability, and disagree with EPA's technical, factual determination that one existing plant, the Logan plant, currently meets all MATS new source standards. 77 Fed. Reg. at 9,387; Response to Comments at 432, 451. Yet, EPA is only required to make a reasonable estimate of the performance of the best performing sources, and EPA's determination on this technical issue of fact is entitled to judicial deference. *See*

*Mossville Envt'l Action Now v. EPA*, 370 F.3d 1232, 1241-42 (D.C. Cir. 2004); *see also Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1051-52 (D.C. Cir. 2001) (deference owed to EPA's technical expertise).

Movants' contention that EPA's pollutant-by-pollutant approach produces a "Frankenplant" not based on what can be achieved in practice is factually wrong. EPA found that the MATS standards are being met by one unit in the case of the new unit standards and 69 units in the case of the existing unit standards. 77 Fed. Reg. at 9,387. EPA did not mechanically apply the lowest measured emission in deriving the standards, but used its engineering judgment to assure that the limits were achieved in practice. MACT Floor Memo (Exh. J to Motion) at 12-14. In establishing limits, EPA considered whether there were "mutually inconsistent control technologies," Response to Comments at 433, and, in fact, in establishing the mercury standard for new sources, excluded two sources that reported mercury emissions lower than the unit on which the standard was based because they represented an "atypical design." MACT Floor Memo (Exh. J to Motion) at 13.

Movants have failed to offer "substantial" arguments on the merits of the issues that they seek to expedite. The arguments presented in the motion either relate to issues that movants do not propose to sever, or consist only of movants' disagreement with EPA as to technical findings with respect to which EPA is entitled to great deference. Therefore, the motion should be denied.

**Conclusion**

    For the reasons set forth herein and in respondents' response to the motion, the motion should be denied.

| | |
|---|---|
| May 17, 2012 | Respectfully submitted, |
| | /s/ Brendan K. Collins |
| | Brendan K. Collins |
| | Robert B. McKinstry, Jr. |
| | Ronald M. Varnum |
| | Lorene L. Boudreau |
| | BALLARD SPAHR LLP |
| | 1735 Market Street, 51st Floor |
| | Philadelphia, PA 19103-7599 |
| | Telephone: (215) 665-8500 |
| | Facsimile: (215) 864-8999 |
| | |
| | *Counsel for Calpine Corporation,* |
| | *Exelon Corporation,* |
| | *National Grid Generation LLC, and* |
| | *Public Service Enterprise Group, Inc.* |

# CERTIFICATE OF SERVICE

I, Brendan K. Collins, a member of the Bar of this Court, hereby certify that on May 17, 2012, I electronically filed the foregoing "Response of Calpine Corporation, Exelon Corporation, National Grid Generation LLC, and Public Service Enterprise Group, Inc., in Opposition to Joint Motion by Developers of New Solid-Fueled Electric Generating Units to Sever and Expedite" with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.

I further certified that I served the foregoing motion on all registered counsel through the Court's CM/ECF system.

/s/ Brendan K. Collins<br>
Brendan K. Collins