Oral Argument Not Yet Scheduled

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

WHITE STALLION ENERGY
CENTER, LLC,

        Petitioner,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

        Respondent.

No 12-1100 and consolidated cases

RESPONSE OF MOVANT-INTERVENORS AMERICAN ACADEMY OF
PEDIATRICS, AMERICAN LUNG ASSOCATION, AMERICAN NURSES
ASSOCIATION, AMERICAN PUBLIC HEALTH ASSOCIATION,
CHESAPEAKE BAY FOUNDATION, CITIZENS FOR PENNSYLVANIA'S
FUTURE, CLEAN AIR COUNCIL, CONSERVATION LAW FOUNDATION,
ENVIRONMENT AMERICA, ENVIRONMENTAL DEFENSE FUND, IZAAK
WALTON LEAGUE OF AMERICA, NATURAL RESOURCES COUNCIL OF
MAINE, NATURAL RESOURCES DEFENSE COUNCIL, OHIO
ENVIRONMENTAL COUNCIL, PHYSICIANS FOR SOCIAL
RESPONSIBILITY, SIERRA CLUB, AND WATERKEEPER ALLIANCE IN
OPPOSITION TO JOINT MOTION TO SEVER AND EXPEDITE

The movant-intervenor health and environmental groups enumerated above oppose the Joint Motion (Doc. No. 1371309) filed by certain petitioners ("Developers") to sever and expedite two issues related to EPA's final Mercury and Air Toxics Standards ("MATS").[1] The action Developers request is premature; neither this Court nor the parties can sensibly set a reasonable schedule at this early stage of the proceedings. Moreover, the issues Developers seek to sever are inextricably related to other issues in this case, making separate consideration impracticable. Finally, Developers have not demonstrated irreparable harm requiring relief, or that they are likely to succeed on the merits of their claims.

## LEGAL AND REGULATORY BACKGROUND

Congress reserved the Clean Air Act's most stringent, health-protective requirements for hazardous air pollutants – toxics that, even in small quantities, are "carcinogenic, mutagenic, teratogenic, neurotoxic, . . . [and] cause reproductive dysfunction" or other similarly severe health effects. 42 U.S.C. § 7412(b)(2) (2012). Those requirements (contained in Section 112 of the Act) include national standards for new and existing major stationary sources of air toxics, reflecting the

---

[1] *National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units*, 77 Fed. Reg. 9,304 (Feb. 16, 2012).

"maximum degree of reduction in emissions . . . achievable." 42 U.S.C.

§ 7412(d)(2). The U.S. Environmental Protection Agency ("EPA") must set an

"emission standard[] for each listed [hazardous air pollutant]," *Nat'l Lime Ass'n v.*

*EPA,* 233 F.3d 625, 634 (D.C. Cir. 2000). And every standard governing newly

constructed sources may "not be less stringent than the emission control that is

achieved in practice by the best controlled similar source, as determined by the

[EPA]." 42 U.S.C. § 7412(d)(3). Standards for existing sources are similarly

constrained; they may be no less stringent than "the average emission limitation

achieved by the best performing 12 percent" of existing sources. 42 U.S.C.

§ 7412(d)(3)(A).

In 2000, EPA determined that it was "appropriate and necessary" to establish

standards for coal- and oil-fired power plants, and listed the industry for regulation

under Section 112. *See* 77 Fed. Reg. at 9,310. Coal- and oil-fired power plants are

the largest domestic source of mercury, a powerful neurotoxin, and they also emit

carcinogenic metals, acid gases, and many other hazardous pollutants. *Id.* EPA

published proposed standards on May 3, 2011[2] specifying (as required by the Act)

that any unit commencing construction after that date would, once built and

---

[2] *National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units*, 76 Fed. Reg. 24,976 (proposed May 3, 2011).

operating, need to meet the standards governing new sources. 76 Fed. Reg. at 25,105. *See* 42 U.S.C. §§ 7412 (g)(2)(b) & (i)(2).[3] The Agency published the final MATS on February 16, 2012. 77 Fed. Reg. at 9,304.

The MATS rule confirms EPA's listing decision, and finalizes standards governing newly constructed and existing coal- and oil-fired power plants. The standards comprise: (1) mercury standards; (2) acid gas standards, which may be met *either* by limiting sulfur dioxide *or* hydrogen chloride; and (3) non-mercury metals standards, which may be met *either* by limiting particulate matter emissions, *or* individual metals. 77 Fed. Reg. at 9,487-88. None of the final limits is more stringent than initially proposed. *See* Ex. A (Declaration of Ranajit Sahu) ¶¶ 9-12.

The methodology used by EPA in setting its MACT standards included statistical analyses of actual emissions data, designed to account for the normal variability over time of the best performing source (or sources, for standards governing existing plants). 76 Fed. Reg. at 25,041, 25,048. *See also* Joint Motion Ex. J at 1, 3-10. Although not required to do so, EPA confirmed that newly designed coal plants could simultaneously achieve all of its new-source standards. 77 Fed. Reg. at 9,390.

---

[3] Sources that receive a case-by-case air toxics emissions limit by permit, prior to the promulgation of a nationally applicable section 112(d) standard, *see* 42 U.S.C. § 7412(g), may seek to delay compliance with a later-issued standard for up to eight years. 40 C.F.R. § 63.44(b)(2) (2012).

On April 13, 2012, EPA proposed new source performance standards for greenhouse gas emissions from new fossil-fuel fired power plants, under section 111(b) of the Clean Air Act, 42 U.S.C. § 7411(b). *Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units*, 77 Fed. Reg. 22,392 (proposed Apr. 13, 2012) ("Proposed NSPS"). That proposal would require greenhouse gas limits for new plants, unless: (a) the plant had a complete pre-construction permit under the Act's Prevention of Significant Deterioration provisions, 42 U.S.C. § 7475, by April 13, 2012; and (b) construction commences by April 13, 2013. 77 Fed. Reg. at 22,436 (proposed 40 C.F.R. § 60.5510(b)(3)). The Regulatory Impact Analysis accompanying the proposal lists fifteen "potential transitional" sources. Ex. B at App. 2-A1. Developers represent five of those sources. Joint Motion at 2 & n.4. The deadline for public comment on the Proposed NSPS is June 25, 2012. *Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units*, 77 Fed. Reg. 26,476, 24,476 (May 4, 2012) (extending public comment period for the rulemaking).

ARGUMENT

I. *Developers' Motion is Premature.*

Developers' motion arrived three weeks before the deadline for intervention in these consolidated cases, and a full month before initial filings and procedural

motions (including any motions to stay the effectiveness of the MATS) are due. *See* Order (Apr. 27, 2012) (Doc. No. 1371247). The deadline for intervening in these consolidated cases was May 16, 2012, *see* Fed. R. App. P. 15(d) & Cir. R. 15(b). Only one of the Developers (and none of the other petitioners) has filed a Statement of Issues. Absent a complete list of the issues and parties before the Court, it is impossible to determine whether Developers are "uniquely" affected by the claims they describe, or how those claims affect other parties and their claims.

Moreover, EPA has not yet resolved multiple administrative petitions for reconsideration of the MATS. Developers' claims rely heavily on two petitions for reconsideration currently before the Agency; other petitions also raise issues related to the standards Developers seek to vacate. *See, e.g*., Joint Motion Exs. B & C (letters to Agency styled as Petitions for Partial Reconsideration). *Compare* Joint Motion at 3, 8-9 (arguing that new source mercury floors are too stringent for detection by current technologies) *with* Joint Motion Ex. B. at 2 (same); *see also* Ex. C at 4-15 (Power4Georgians' ("P4G") petition seeking reconsideration as to the legality of EPA's variability analysis, an issue which Developers' Motion, at 12-18, seeks to expedite).

Similarly, the deadlines for EPA and this Court to receive requests to stay any portion of the MATS pending review have not yet passed. Disposition of such requests could affect case management profoundly. The merits briefing schedule

should be set after initial submissions and the resolution of such procedural motions, and should be informed by all parties' views on the proper briefing format and schedule.

## II. *Developers' Claims Are Not Severable.*

Developers ask this Court to sever and expedite its review of two issues: (1) whether certain of EPA's new source limits properly account for variability in emissions performance, and reflect the emissions of the best-performing similar source; and (2) whether EPA's "pollutant-by-pollutant" approach to setting standards contradicts the statute. Joint Motion at 12-18, Joint Notice of Further Clarification (Doc. No. 1373043) ("Not. Clarif.") at 5-6. Those issues, however, are directly and fundamentally related to other aspects of this consolidated case.

Developers first challenge EPA's statistical and analytic methodology for calculating the emissions of the "best controlled similar source." 42 U.S.C. § 7412(d)(3); Joint Motion at 12-15, Not. Clarif. at 5-6. EPA used that same methodology to set all of the limits in the MATS. Each of those limits – both for existing and new sources – is based on a statistical "upper prediction limit," and upon the same delineation of "similar" sources. Joint Motion Ex. J at 1, 4-9, 13. Based on comments in the record, other industry petitioners can be expected to challenge these methodologies in the context of EPA's existing source standards. As a result, the Court's resolution of this issue in the context of Developers'

challenge, nominally with regard to the new source standards, could determine the outcome of those similar challenges to the existing source standards, without those challenges ever being briefed.

Second, Developers contest the legality of the "pollutant-by-pollutant" approach EPA used in setting its standards. *See* Joint Motion at 16-18. Just as EPA used a consistent methodology for all its standards, EPA set pollutant-by-pollutant limits throughout the MATS. *See* Joint Motion Ex. J. A ruling on Developers' pollutant-by-pollutant issue would therefore similarly dispose of other petitioners' challenges to the existing source standards.

Developers provide no justification for severance of these issues, both of which are inextricably intertwined with the remainder of the case. They do not argue that the issues they seek to sever concern only them, or distinguish those issues from others likely to be raised.[4] The requested severance cannot be practicably accomplished.

---

[4] Developers' proposed briefing format also seeks unusual and inappropriate word allocations. *See* Joint Motion Ex. A. First, their proposal would grant petitioner-intervenors a separate brief with its own word allocation, *id.* at 2, contrary to this Court's usual practice of requiring intervenors supporting petitioners to join in petitioners' briefs and share their word limits. Second, Developers proposal limits respondent-intervenors to 3500 words, *id.*, rather than the standard 8750 words (*see* D.C. Cir. R. 32(a)(2)(B)(i)), even though respondent-intervenors include diverse parties including states and other power-plant developers. The briefing format is objectionable in both respects.

### III. *Developers Have Not Demonstrated Irreparable Harm.*

No irreparable, non-speculative harm requires severance and expedition of Developers' issues. Developers' purported injuries rest on three false claims. They assert that judicial review will result in a "delay of one to two years" in the commencement of construction, Joint Motion at 5-6; but Developers are not prepared to start construction of their plants even during that period, whether or not their challenge is severed and expedited. Second, Developers assert that the MATS' limits for new coal-fired power plants are so stringent that they cannot be met, Joint Motion at 8-9; but EPA's record belies that assertion. And third, Developers state that, absent expedition, they will be unable to evade other pollution-standards that might otherwise apply; but that complaint – directed at the Proposed NSPS – is too speculative to constitute an irreparable injury.

### A. *Developers' Failure to Construct Is Not Caused by the MATS*

Developers assert that they are prevented from proceeding with construction of their projects *only* by EPA's MATS. Joint Motion at 4-5, 7-8. Developers are not, however, currently prepared to begin construction of any of their five planned power plants.

Three of those projects lack the Clean Air Act permits necessary to begin construction. *See* 42 U.S.C. § 7475(a) (describing preconstruction requirements); *see also* 42 U.S.C. § 7410(j) (conditioning issuance of Clean Air Act construction

permits on a prior demonstration that the construction of such source will be in compliance with all requirements of the Act). Developer P4G's initial permit for its proposed Plant Washington, for example, was found legally deficient and remanded; the amended permit is currently stayed pending administrative review. *See* Ex. D (Declaration of Kurt D. Ebersbach) ¶¶ 8-25. Developers Deseret Power Electric Cooperative and Sunflower Electric Power Corporation similarly lack the Clean Air Act permits necessary to commence construction. *See* Joint Motion Ex. E ¶¶ 7, 8, Joint Motion Ex. F ¶¶ 7, 8 (acknowledging that the preconstruction "Prevention of Significant Deterioration" permit for Sunflower's Holcomb 2 project is stayed and on appeal before the Kansas Supreme Court, with a ruling expected sometime in 2013); Ex. E (decision of EPA's Environmental Appeals Board remanding Prevention of Significant Deterioration permit for Deseret's Bonanza project).

The projects also lack other required authorizations and necessary design elements. P4G has not, for example, obtained the Plant Washington project site, or completed critical design elements for the plant. Ex. D ¶¶ 30-32. The Holcomb 2 project requires review under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., which has not yet begun. White Stallion has not yet acquired the water rights its project requires, or necessary wastewater permits. Ex. F (Declaration of Casey Roberts) ¶¶ 4-12. And Tenaska's Trailblazer project has yet

to meet several necessary requirements, including confirmation on a price for carbon dioxide that will cover its expected carbon-capture costs. *See* Ex. G at 2, Ex. H at 64. Consequently, "Tenaska has not yet made a decision on whether to proceed with the Trailblazer [project]." Tenaska Trailblazer Energy Center, *Frequently Asked Questions*, http://www.tenaskatrailblazer.com/qa.html#21 (last viewed May 16, 2012).

In sum, not one of Developers' five projects is ready to begin construction. Each project faces substantial hurdles. Developers' claim that expedited review of the MATS is necessary to prevent irreparable harm to them is, to put it charitably, highly speculative.

B. *New Plants Can Comply with EPA's MATS.*

Contrary to the Developers' claims, the MATS do not prevent construction of new coal-fired plants. The data collected by EPA demonstrates that all three of the rule's standards can be simultaneously met; that data shows that one plant "is meeting all three final [air toxics] limits and at least eight [plants] . . . are meeting one or more of the new source limits." 77 Fed. Reg. at 9,390.

One Developer (P4G) has acknowledged that its proposed plant *can* meet the MATS. *See, e.g.,* Ex. D ¶¶ 27-28 & Att. 8 at 15 (stating "the very fact that the [MATS] Rule has been promulgated will necessarily drive the design of the pollution control systems at Plant Washington, and the facility will be designed

and constructed to meet the standards in the Final Rule"); Ex. D ¶ 29, Att. 9 at 1

(C. Dean Alford stating that "[w]e believe we can meet" the MATS, and

explaining that P4G does not oppose MATS because it cannot comply with it, but

because, if the rule is weakened, "we don't have to spend as much money"). *Cf.*

Joint Motion Ex. H ¶¶ 6, 14-16 (Alford testimony questioning whether Plant

Washington can comply with the MATS). Two of Developers' other proposed

plants have secured case-by-case limits by permit under 42 U.S.C. § 7412(g). Ex. I

at 7-14, Joint Motion Ex. I ¶ 8. They may, therefore, seek to defer compliance for

up to 8 years, 40 C.F.R. § 63.44(b)(2).[5]

    Indeed, Developers do not suggest that the required pollution *reductions* are

impossible; they claim inability to measure them, and thereby demonstrate

compliance. Joint Motion at 8-9. Developers offer nothing to support that claim

with respect to the standards for non-mercury metals and acid gases. The

administrative petitions upon which Developers' rely acknowledge that the non-

mercury metals standard for new plants sets limits (for particulate matter) that are

---

[5] Developers do not, in fact, claim that their plants are *incapable* of meeting the limits; only that vendors "*will not guarantee their equipment* to the level the MATS rule requires." Joint Motion at 8 (emphasis added). As EPA has long recognized, "lack of a vendor guarantee by itself does not present sufficient justification that . . . an emissions limit is technically infeasible." EPA, *New Source Review Workshop Manual* (Draft Oct. 1990) at B.20 (available at http://www.epa.gov/ttn/nsr/gen/wkshpman.pdf).

"above" the level at which readily available control devices can measure emissions. Joint Motion Ex. C at 3. *See* Ex. A ¶¶ 24-27. And Developers raise no difficulties in meeting the MATS' sulfur dioxide limit for new plants, and thereby satisfying the rule's acid gas standard. [6] *See* 77 Fed. Reg. at 9,421 (noting that plants with sulfur dioxide controls may "[m]onitor compliance continuously with the alternate [sulfur dioxide] emission limit"). Nor would any such difficulties be credible; standard sulfur-dioxide monitoring techniques can easily and accurately measure pollution at the levels required by the MATS. *See* Ex. A at ¶¶ 28-35.

Developers' purported harm is thus limited to the MATS' mercury standards – and premised upon a disagreement with EPA's technical judgment that existing technologies permit accurate measurement of mercury emissions at the levels the MATS prescribes for new coal-fired plants. Joint Motion Exs. B at 1, C at 3. EPA thoroughly explained and documented that judgment. Because "detection levels" vary widely between manufacturers and analytic laboratories, EPA identified a "representative detection level" by calculating an "arithmetic mean value" from "all of the available reported pollution-specific method detection levels" used to calculate its standards.77 Fed. Reg. at 9,390. *See* Ex. A ¶¶ 18-20. Then, EPA chose

---

[6] One of the two petitions supporting Developers' motion disputes one measurement method provided for the MATS' hydrogen chloride limit, Joint Motion Ex. C at 3 – but the rule does not require Developers to meet that limit. 77 Fed. Reg. at 9,421 (noting alternative sulfur dioxide limit). *See* Ex. A ¶¶ 16, 28-31. And, at any rate, the asserted difficulties do not exist. Ex. A ¶¶ 32-35.

a level three times higher than the representative detection level as the point at which emissions could be accurately measured with confidence, and ensured that all of the MATS' limits were above that threshold. 77 Fed. Reg. at 9,390. *See* Ex. A ¶¶ 21-23.[7] It further confirmed, with data from its own experience, that available methods "provide the measurement certainty sufficient for sources to demonstrate compliance" with the new-source limits. 77 Fed. Reg. at 9,391; Ex. A, Att. 2 (EPA's Response to Comments) at Vol. 1, pp. 524 & 529-30. Developers' "harm" requires this Court to second-guess that technical assessment – and they have provided no reasonable grounds to do so. Ex. A ¶¶ 36-51. *See Am. Farm Bureau Fed'n v. EPA,* 559 F.3d 512, 519 (D.C. Cir. 2009) (noting "extreme degree of deference" accorded EPA "when it is evaluating scientific data within its technical expertise")

C. *Any Injury Arising from the Proposed NSPS is Speculative.*

Developers claim that they *will* be forced out of business by the pollution-reduction requirements imposed by the Proposed NSPS on plants which commence construction after April 13, 2013. That claim – based on the content of a proposal which may be altered before being finalized – is highly speculative. This Court defines "irreparable injury" as an injury that is "both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.

---

[7] That approach provided a very conservative threshold for the accurate measurement of pollutants.

Cir. 1985). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Id.* (emphasis in original). The Proposed NSPS provides no such certainty, and cannot be the basis for an irreparable injury.

This Court has recognized that "[a]n agency…may promulgate final rules that differ from the proposed regulations." *Shell Oil Co. v. EPA*, 950 F.2d 741, 750 (D.C. Cir. 1991). EPA has often – and recently – issued final rules that diverge from the proposal. *See, e.g., Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews*, EPA-HQ-OAR-2010-0505 (April 18, 2012) (available at http://www.epa.gov/airquality/oilandgas/pdfs/20120417finalrule.pdf ) (EPA final rule exempting certain sources covered by the proposed rule, and delaying some compliance dates for years longer than proposal). EPA's Final NSPS may establish different compliance dates (the proposal provides 30 years for compliance with the standard under the Proposed NSPS). *See* 77 Fed. Reg. at 22,436 (Proposed 40 C.F.R. §60.5520(b)). It may increase the proposed standards. *Id.* Definitions provided in the Proposed NSPS may change, or be removed completely.

Even if the Proposed NSPS is finalized without change, Developers have not demonstrated that their projects would be affected. The Proposed NSPS requires compliance in 30 years – hardly consistent with an imminent injury. *See* 77 Fed.

Reg. at 22,436. One of Developers' projects (Tenaska's Trailblazer plant) includes carbon dioxide reduction technologies that should allow compliance with the Proposed NSPS. *See* Joint Motion Ex. G ¶ 15 (describing planned "carbon capture and sequestration" technology). Others (Deseret Power's Bonanza Plant, P4G's Plant Washington, and the White Stallion plant) lacked the "complete permit," on April 13, 2012, needed to qualify as a "transitional source" under the proposal.[8] In sum, Developers have shown no certain, actual harm from the Proposed NSPS.

IV. *Developers Are Not Likely to Succeed on the Merits.*

A. *EPA's New Source Standards Reflect the Statutory Requirements.*

Neither of the challenges Developers seek to sever is likely to succeed. Developers claim, first, that EPA's standards fail to reflect the statutory standard, based on a disagreement with EPA's "methodology to account for emissions variability," Joint Motion at 14, and its identification of "similar" sources, Not. Clarif. 5-6. Developers have three specific complaints. They claim that EPA did not "adequately explain" its choice of methodology, Joint Motion at 14. But EPA extensively explained its approach to variability – in its proposal, the record, and

---

[8] The Bonanza plant has no valid permit at all; its permit (which the U.S. Environmental Appeals Board never approved) has long since expired. Ex. A, Att. 9 at p.32. Plant Washington's permit remains stayed by a legal challenge and pending before the agency for further amendment. Ex. D ¶¶ 8-25. White Stallion's Prevention of Significant Determination permit is not "complete"; one portion of it remains before the permitting agency. Ex. J. *See also* http://www10.tceq.state.tx.us/epic/efilings/index.cfm?fuseaction=search.searchByS OAH (agency's docket sheet describing status of ongoing proceeding).

response to comments, 76 Fed. Reg. 24,976, 25,048 (May 3, 2011) (describing EPA's statistical analysis of data to account for variability from the best-performing source). *See also* 76 Fed. Reg. at 25,041-45 (describing methodology in detail); Ex. A, Att. 2, at Vol. 1, pp. 460, 490-521 (EPA's Response to Comments noting extension of averaging period and statistical analysis to account for variability), Att. 3 at pp. 4-8 (memorandum in record describing approach).

Developers' second claim likewise takes issue with EPA's exercise of its technical and statutory discretion. EPA used stack tests – three one-hour tests designed to measure pollution – to devise its limits. EPA determined that the "emission control . . . achieved in practice by the best controlled similar source," 42 U.S.C. §7412(d)(3), was best reflected by that source's best (that is, lowest-pollution) stack test, adjusted by a statistical formula to account for long-term variability. 76 Fed. Reg. at 25,047-48. Developers complain that EPA also possessed, in some (but not all) instances, other tests in which those sources had much higher emissions.[9] *See* Joint Motion Ex. D at 2. EPA's decision to base its estimation on data from the plants' best tests, rather than their worst, is well within the Agency's discretion. *See Mossville Environmental Action Now v. EPA,* 370

---

[9] As Developers acknowledge, EPA had no such additional tests for the source used to create its mercury standard for new coal-fired plants. That mercury standard is, according to Developers' evidence, solely responsible for the harms they allege. *See above* at pp.11-12. Success on this claim would not, as a result, alleviate that harm.

F.3d 1232, 1242 (D.C. Cir. 2004) (upholding air toxics standards where EPA

provides "factual data" showing it "reasonably estimate[d] the performance of the

best performers"). *See* 77 Fed. Reg. at 9,390, Ex. A, Att. 2 Vol. 1 at p.496

(concluding that to set standard at "level achieved by the best performers when

they are operating under a worst-case scenario" would "go[] against established

statistical theory and practice, and . . . also against the intention of the statute").

    Developers contend, finally, that EPA "erred by establishing new-unit standards

based on sources that are not 'similar'" to the coal-fired units that will be subject to

those standards, thereby violating 42 U.S.C. § 7412(d)(3). Not. Clarif. 6. The Act

does not permit EPA to distinguish between sources on the grounds suggested by

Developers, Joint Motion 20 (seeking separate standards for plants using high-

chlorine coal, and using different combustion technologies).[10] *See Natural Res.*

*Def. Council v. EPA,* 489 F.3d 1364, 1372-73 (D.C. Cir. 2007); 42 U.S.C. §

7412(d)(2) (requiring "substitution of materials" and "process changes" to reduce

air toxics); *Nat'l Lime Ass'n,* 233 F.3d at 634 (noting congressional intent to

require "substitution of materials less hazardous" and "process changes") (citation

omitted). And, in any event, EPA offered a well-reasoned and supported

explanation for its decision: "the record . . . demonstrates that coal-fired [power

plants]" burning higher-pollutant fuels, or using different combustion methods,

---

[10] EPA did establish separate standards for units burning high-mercury coals, and
those using "integrated combined cycle gasification" combustion technologies.

"have similar [air toxics] emissions" and that "similar control approaches" are available to all such plants. 77 Fed. Reg. at 9,395. *See* 40 C.F.R. § 63.41 (noting that sources are similar if they may be controlled using same methods).

B. *The Clean Air Act Requires EPA to Base Its Standards on the Best Performer for Each Hazardous Air Pollutant.*

EPA based each pollutant-specific limit in the MATS – as it has in every previous Clean Air Act Section 112 rule-making – on the emissions of the "similar source" (or sources) demonstrating the "best controlled" performance for that specific pollutant. 42 U.S.C. § 7412(d)(3). The air toxics addressed by the MATS are controlled by different pollution-reduction technologies. Different plants include different combinations of those technologies; some include mercury controls, but no acid gas controls, others control acid gases but not toxic metals, and so forth. No single plant (or group of plants) produces the "best controlled" emissions for every pollutant. Indeed, a plant that is best controlled for one air toxic may be among the worst controlled for another. Ex. A, Att. 2 at Vol. 1 p.432. Consequently, EPA used a different plant (or group of plants) to inform each of the MATS' mercury, acid gas, and particulate matter standards. *See id.* at Vol. 1 pp. 431-434.

Developers argue that this violates the statute; they contend that *all* of EPA's air toxics standards must be based upon a single plant (or group of plants), because EPA must set standards that "will allow new units to be built." Joint Motion at 16.

That argument fails, as a matter of fact, law, and common sense. First, EPA *did* set standards that will allow new units to be built. The Agency determined, in establishing the MATS, that its new-source limits "are representative of what a new coal-fired [plant] would look like." 77 Fed. Reg. 9,390. And it confirmed that existing plants demonstrated the possibility of meeting all three standards simultaneously. *Id.*

Second, the statute requires the pollutant-specific approach adopted by EPA. Section 112 creates a "clear statutory obligation to set emission standards for *each* listed [hazardous pollutant]." *National Lime Ass'n,* 233 F.3d at 634 (interpreting language of 42 U.S.C. § 7412(d)(1)) (emphasis added). And every such standard must reflect "the emission control that is achieved in practice by the best controlled similar source" (or sources, in the case of existing plants) 42 U.S.C. §7412(d)(3). Together, those two statutory provisions require EPA to establish standards for *each* pollutant reflecting the *best* emission control achieved – necessarily, for *that* pollutant. The statute does not permit EPA to set a standard for one pollutant well below the best achieved control, merely because a plant is well-controlled for some other pollutant.[11]

---

[11] Developers' desired approach would force EPA into an analysis incompatible with the statutory text: whether a plant that controls its mercury, e.g., but not other air toxics, is nevertheless a "best controlled" plant.

And third, as a practical matter, there is no plausible reason for a different approach. Power plants (unlike baseball players, *cf.* Joint Motion at 16-17) are mechanical assemblies with interchangeable parts. The toxics regulated by the MATS – mercury, acid gases, and particulate matter – are reduced by adding control technologies that can be readily combined, and are entirely compatible. Ex. A at ¶¶ 13-17. There is, accordingly, no tension between the standards – and no reason to employ a legal analysis that compels a false trade-off between them.

## V. CONCLUSION

The Developers' Joint Motion should be denied.

Respectfully submitted,

| | |
|---|---|
| /s/James S. Pew (with permission) | /s/Sanjay Narayan |
| James S. Pew | Sanjay Narayan |
| Earthjustice | Sierra Club Environmental Law |
| 1625 Massachusetts Ave., NW | Program |
| Suite 702 | 85 Second Street, 2nd Floor |
| Washington, DC 20036-2212 | San Francisco, CA, 94105 |
| (202) 667-4500 | (415) 977-5769 |
| jpew@earthjustice.org | Sanjay.narayan@sierraclub.org |
| | |
| *Counsel for Chesapeake Bay* | *Counsel for Sierra Club* |
| *Foundation, Clean Air Council, Sierra* | |
| *Club, and Waterkeeper Alliance* | |

/s/John Suttles (with permission)
John Suttles
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2559
(919) 967-1450
jsuttles@selcnc.org


*Counsel for American Academy of Pediatrics, American Lung Association, American Nurses Association, American Public Health Association, and Physicians for Social Responsibility*


/s/Sean Donahue (with permission)
Donahue & Goldberg, LLP
2000 L St., NW Suite 808
Washington, DC 20036
(202)277.7085
*sean@donahuegoldberg.com*

Vickie Patton
Pamela Campos
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 440-4901

*Counsel for Environmental Defense Fund*

/s/Ann Brewster Weeks (with permission)
Ann Brewster Weeks
Darin Schroeder
Clean Air Task Force
18 Tremont St., Suite 530
Boston, MA 02139
(617) 624-0234
aweeks@catf.us
dschroeder@catf.us


*Counsel for Citizens for Pennsylvania's Future, Conservation Law Foundation, Environment America, The Izaak Walton League of America, Natural Resources Council of Maine, and the Ohio Environmental Council*


/s/John D. Walke (with permission)
John D. Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-2406
jwalke@nrdc.org
edavis@nrdc.org


*Counsel for Natural Resources Defense Council*

Dated: May 17, 2012

## CERTIFICATE OF SERVICE

I certify that on this 17th day of May, 2012, a copy of the foregoing *Response of Movant-Intervenors American Academy of Pediatrics, American Lung Assocation, American Nurses Association, American Public Health Association, Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Clean Air Council, Conservation Law Foundation, Environment America, Environmental Defense Fund, Izaak Walton League of America, Natural Resources Council of Maine, Natural Resources Defense Council, Ohio Environmental Council, Physicians for Social Responsibility, Sierra Club, and Waterkeeper Alliance In Opposition to Joint Motion to Sever and Expedite* was served electronically through the Court's CM/ECF system on all registered counsel.

/s/Andrea Sanchez