## UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

WHITE STALLION ENERGY
CENTER, LLC, DESERET POWER
ELECTRIC COOPERATIVE,
SUNFLOWER ELECTRIC POWER
CORP., TRI-STATE GENERATION &
TRANSMISSION ASSOCIATION, INC.,
TENASKA TRAILBLAZER
PARTNERS, LLC and
POWER4GEORGIANS, LLC,

        Petitioners,

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Respondent.

Nos. 12-1100, 12-1176, 12-1177,
12-1178, 12-1180, 12-1184

**NEW UNIT DEVELOPERS' CONSOLIDATED REPLY IN SUPPORT OF
JOINT MOTION BY DEVELOPERS OF NEW SOLID-FUELED
ELECTRIC GENERATING UNITS TO SEVER AND EXPEDITE
CONSIDERATION OF ISSUES GERMANE TO HAZARDOUS AIR
POLLUTANT STANDARDS APPLICABLE TO NEW UNITS
(CORRECTED)**

Over the past year, the United States Environmental Protection Agency ("EPA") has issued sweeping new rules under the Clean Air Act ("CAA") regulating the electric utility industry. The combined effect of two of these rules—EPA's "MATS rule" governing the emission of hazardous air pollutants[1] ("HAPS") and EPA's proposed new source performance standards regulating greenhouse gas emissions[2]—creates a regulatory Catch-22 for New Unit Developers that directly jeopardizes their projects. As EPA admits, application of the GHG NSPS to New Unit Developers would "result in the loss of their sunk costs," which exceed $150 million, and "abandonment" of their projects. 77 Fed. Reg. at 22,422. In recognition of this fact, and because (unlike other rules) new source performance standards become applicable to new sources the moment the *proposed* rules are published and before they are finalized, *see* 42 U.S.C. § 7411(a)(2), EPA exempted from the GHG NSPS "transitional sources" that had received approval for their PSD preconstruction permits and that commence construction within one year of the proposed rule's publication. *See* 77 Fed. Reg. at 22,422. New Unit Developers are all expressly identified as transitional sources in the GHG NSPS, *see id.*, and they are now spending millions of dollars to meet EPA's one-year deadline.

---

[1] *National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units,* 77 Fed. Reg. 9,304 (Feb. 16, 2012) ("MATS rule").

[2] *Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units,* 77 Fed. Reg. 22,392 (Apr. 13, 2012) ("GHG NSPS").

Unfortunately, New Unit Developers' efforts to comply with EPA's one-year deadline are directly stymied by the MATS rule's arbitrary and unreasonable new-unit emission limits, which are so low that vendors of required pollution control technologies will not guarantee that they can be met. Because such guarantees are a precondition to obtaining financing for their projects, *see, e.g.*, Declaration of Ralph Roberson ¶ 16 (attached as Exhibit D to Joint Motion), New Unit Developers must obtain relief from the new-unit standards in time to commence construction before expiration of the one-year deadline EPA has imposed. Expedited review of the MATS rule new-unit standards therefore represents the only avenue for meaningful relief from EPA's multiple rulemakings.

Against this backdrop, none of the arguments EPA and others[3] offer to oppose expedited review of the new-unit standards is persuasive. First, Opponents' arguments that New Unit Developers cannot demonstrate irreparable harm because the GHG NSPS is only "a proposal" ignore the present effects of the GHG NSPS, and reduce to assertions that New Unit Developers should not be afforded meaningful review of the MATS rule new-unit standards on a schedule consistent

---

[3] In addition to EPA, three groups of intervenor-respondents oppose severance and expedited review of the new-unit issues: (1) Calpine Corporation and other competing electric generation companies with significant natural gas portfolios (Doc. 1374325) ("Competitors"); (2) a collection of states and local governments that have intervened in support of EPA (Doc. 1374363) ("Connecticut"); and (3) a coalition of environmental groups and other non-governmental organizations (Doc. 1374331) ("NGOs"). Collectively, these groups opposing severance of the new-unit issues and expedited review are referred to as "Opponents."

with EPA's parallel GHS NSPS rulemaking. But our system of justice entitles regulated parties an opportunity for *meaningful* judicial review of EPA's decisions, and New Unit Developers should not be denied this fundamental protection from unlawful agency decision-making that threatens their very existence merely because EPA chose to impose conjunctive requirements in separate rules. *See, e.g.*, *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("It is not absurd to require that an agency's right hand take account of what its left hand is doing.").

Second, Opponents' assertions that the new-unit standards are not subject to substantial challenge amount to nothing more than a claim that EPA should be afforded substantial deference in interpreting the CAA. Under that justification, no challenge to an EPA rule could ever be "substantial" for purposes of a motion to expedite, which is clearly not the case. *See id.* (expediting review and vacating rule).

Finally, Opponents mistakenly claim that severing the issues relating to the MATS rule new-unit standards would frustrate judicial economy. The issues New Unit Developers seek to raise, however, are fully severable from the main body of issues to be litigated in this complex proceeding; the expedited proceeding will resolve *all claims* specific to the new-unit standards; and no party will be prejudiced by severance and expedition. The motion should be granted.

## I.     New Unit Developers Meet the Test for Severance and Expedited Review

Expedited review will be granted where "delay will cause irreparable injury" and

"the decision under review is subject to substantial challenge." D.C. Circuit

Handbook 33 (2011). New Unit Developers readily meet this standard.

### A. New Unit Developers Face Irreparable Harm Absent Expedited Review

#### 1. The Harm Results From the Combined Effect of the Two EPA Rules and It Is Certain, Not Speculative

EPA and the other Opponents claim that any harm New Unit Developers face

stems from the GHG NSPS alone, and not the MATS rule new-unit standards. *See*

EPA Resp. at 7-9; Competitors Resp. at 9-11; Connecticut Resp. at 2-3; NGOs' Resp.

at 13-15. Thus, the argument goes, New Unit Developers cannot demonstrate that

they face irreparable injury because the GHG NSPS is a proposed rule that might be

changed as a result of the comment process, and New Unit Developers' sole remedy

accordingly lies in the GHG NSPS rulemaking process. Opponents are wrong on

both points and their reasoning should be rejected.

The irreparable harm New Unit Developers face is neither "speculative" nor

"hypothetical," and it does not result from the GHG NSPS alone. Absent the MATS

rule new-unit standards, New Unit Developers would be able to complete the design

of their pollution control equipment and secure the guarantees from the pollution

control equipment vendors that are necessary to finance their projects and commence

construction. *See, e.g.*, Declaration of Wayne E. Penrod ¶ 13 (attached as Exhibit E to

Joint Motion); Declaration of Kenneth J. Anderson ¶ 11 (attached as Exhibit F to

Joint Motion); Declaration of Frank Rotondi ¶ 17, 19 (attached as Exhibit I to Joint

Motion).  Tellingly, EPA does not dispute that New Unit Developers cannot move

forward with their projects because pollution control equipment vendors disagree

with EPA that the new-unit standards are achievable in practice, and they will not

guarantee their equipment can meet them.  *See* Institute of Clean Air Companies,

Request for Partial Reconsideration of EPA's National Emission Standards for

Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating

Units, April 16, 2012, at 2 (attached as Exhibit B to Joint Motion); Babcock & Wilcox

Power Generation Group, Inc., Request for Partial Reconsideration, April 16, 2012, at

1-4 (attached as Exhibit C to Joint Motion); *see also* Roberson Declaration ¶ 2.

While this predicament is intolerable in and of itself, the harm resulting from

EPA's new-unit standards is increased exponentially by EPA's concurrent GHG

NSPS rulemaking.  The GHG NSPS expressly identifies New Unit Developers'

projects as "transitional sources" that have only one year from the date of publication

*of the proposed rule* on April 13, 2012 to commence construction in order to avoid the

rule's project-killing effect.  *See* 77 Fed. Reg. at 22,421-22 (identifying projects as

transitional sources, acknowledging that application of the GHG NSPS would result

in loss of their "substantial sunk costs" and force "abandonment" of their projects,

and stating that the one-year window "would not be extended for any reason").

Although it is a proposed rule, the GHG NSPS applies to New Unit

Developers as of the date it was published, *see* 42 U.S.C. § 7411(a)(2) (a source is

considered to be a "new" source subject to NSPS as of the date a proposed NSPS is

published), and New Unit Developers must work now to meet the one-year clock that began ticking with that proposed rule. One year is a remarkably short time to commence construction on a facility as complex as a coal-fired power plant. For New Unit Developers to have any hope of meeting EPA's deadline, they must complete the design of their facilities, negotiate their construction contracts, obtain their pollution control equipment guarantees, and seek financing in the marketplace now. But precious weeks and months are being lost as a result of the MATS rule new-unit standards, and New Unit Developers' projects move closer to regulatory oblivion with each tick of the clock. This is the epitome of irreparable harm.[4]

## 2. The Prospect of Changes to the GHG NSPS Through the Comment Process Does Not Provide an Adequate Remedy

Opponents do not dispute that New Unit Developers would be denied any opportunity for meaningful judicial review of the MATS rule new-unit standards if their claims are resolved in the normal course and the one-year deadline is not extended. Instead, they argue only that New Unit Developers have not suffered a

---

[4] EPA's suggestion (Resp. at 12-13) that New Unit Developers "have not substantiated that any marginal difference between [their] proposed briefing schedule and some other briefing schedule this Court might order would cause any material delay" misconstrues the nature of the relief sought. New Unit Developers are not simply requesting shortened intervals "between opening and reply briefs." They are seeking expedited treatment of their entire case, which would include oral argument and disposition on a schedule consistent with EPA's deadlines in the GHG NSPS. Additionally, given that EPA has provided New Unit Developers just 12 months to commence construction of their projects and imposed a hard deadline of April 13, 2013, "a few additional months" of delay is most certainly "material," and would mean the difference between life and death for their projects.

legally cognizable harm because New Unit Developers can submit comments to EPA on the GHG NSPS and hope for relief. These arguments only highlight the perfect "heads I win, tails you lose" scenario EPA has created. Conspicuously absent from EPA's response is any suggestion that it would extend the GHG NSPS one-year deadline to accommodate the need to resolve New Unit Developers' claims, and EPA's implication that it might do so is cold comfort given EPA's vigorous defense of the new-unit standards in this case and its express declaration that the one-year deadline "would not be extended for any reason."[5] *See* 77 Fed. Reg. at 22,422.

Moreover, EPA has expressly acknowledged that resort to the GHG NSPS comment process is wholly inadequate, and that New Unit Developers cannot wait to commence construction until the rule is issued in final form. *See id.* As EPA recognized in the GHG NSPS, New Unit Developers cannot defer their design and construction work until the rule is finalized and EPA determines whether it will, or will not, extend the one-year deadline. *See id.* Requiring them to do so would, in EPA's words, "have the effect of forcing [New Unit Developers] to delay commencing construction until after we [EPA] finalize the standards, at which time they would have missed their 12-month window to commence construction and as a result, would fail to qualify as transitional sources." *Id.* Thus, the resort to the

---

[5] Indeed, would EPA even have authority to tie its interpretation of the NSPS requirements of CAA § 111 to judicial resolution of the MATS rule under CAA § 112? Certainly, nothing in the preamble to the proposed GHG NSPS suggests such authority or even takes the MATS rule judicial timetable into consideration.

comment process that EPA now proposes would provide no relief at all.

In sum, EPA has already rejected New Unit Developers' position that the new-unit standards are unreasonably stringent and unlawful. *See* EPA Resp. at 17-18. EPA has already stated that the one-year deadline for commencing construction will "not be extended for any reason." 77 Fed. Reg. 22,422.[6] And EPA has recognized that New Unit Developers cannot wait to commence construction until the final terms of the GHG NSPS are known. *Id.* On these facts, which are undisputed, EPA's suggestion that relief might be granted through the GHG NSPS comment process provides no basis for this Court to refuse to grant expedited review.

### 3. The Harm Is Redressable Through This Action Because the Appropriate Remedy Is Vacatur

Connecticut, but not EPA, asserts that the harm to New Unit Developers resulting from EPA's arbitrary and capricious new-unit standards is not redressable because the rule affords public health benefits and the remedy in this case therefore will be remand without vacatur. *See* Connecticut Resp. at 3-4. But as it relates to New Unit Developers' projects—and to any other new projects that might be constructed in the future—the MATS rule affords no public health benefits at all. CAA § 112(g) requires all new major sources of HAPs to obtain a "case-by-case" maximum achievable control technology ("MACT") determination prior to commencing

---

[6] *See also* 77 Fed. Reg. at 22,423 ("…12 months is long enough to give these sources a reasonable period to commence construction in accordance with the terms of their permit. Any proposed source that does not commence construction within 12 months cannot be said to be similarly situated.").

construction when there is no applicable source category standard in place. *See* 42 U.S.C. § 7412(g). According to EPA, these case-by-case MACT determinations should result in standards that are "at least as stringent as any subsequent requirements for existing sources adopted as part of a MACT standard issued under section 112(d)." EPA, Hazardous Air Pollutants: Regulations Governing Constructed or Reconstructed Major Sources, 61 Fed. Reg. 68,384, 68,396 (Dec. 27, 1996).

Each of New Unit Developers has been issued a case-by-case MACT determination, or has been determined not to be a major source of HAPs. During the period of any remand following vacatur by this Court, New Unit Developers and all other new sources will therefore be subject to stringent case-by-case MACT determinations that are at least as protective as any lawful standard that EPA might issue, *see id.*, and they will be required to comply with the final source category standard once it is promulgated following remand, *see* 40 C.F.R. § 63.44. Accordingly, Connecticut's claim that the supposed health benefits of the rule would justify the remedy of remand but not vacatur is not correct.

### 4. New Unit Developers' Motion Is Timely and Consistent With Their Demonstration of Irreparable Harm

Competitors argue that New Unit Developers unreasonably delayed in seeking expedited review, and that this demonstrates that New Unit Developers have not been irreparably harmed. *See* Competitors Resp. at 14, EPA Resp. at 13. The NGOs, in contrast, argue that New Unit Developers' motion should be denied because it was

"premature," and that New Unit Developers did not wait long enough.[7] *See* NGOs Resp. at 4-6.

In fact, both sides are wrong. New Unit Developers' irreparable injury did not crystallize until EPA published the GHG NSPS in the Federal Register on April 13, 2012, which started the one-year clock to commence construction. New Unit Developers moved quickly after that, filing their motion for expedited review just two weeks later on April 27, 2012. Under the circumstances of this complex case, New Unit Developers acted appropriately and the timing of their request for expedited review is perfectly consistent with their demonstration of irreparable harm.

## 5. The Other Asserted Obstacles to Commencing Construction Provide No Basis to Deny Expedited Review

Opponents' claims that expedited review should be denied because New Unit Developers "may not" be able to commence construction within the time EPA has provided due to other permitting issues fare no better. As the attached declarations show, Opponents grossly overstate the impediments to commencing construction that New Unit Developers face. For example:

**The P4G Project**: Opponents claim that P4G has not acquired the property on which the facility is to be built, pointing to several deeds into an entity known as Washington Timberlands, LLC. NGOs Resp. at 9 & Exhibit D ¶ 30. This is wrong.

---

[7] Again, these conflicting assertions that the motion for expedited review was simultaneously "tardy" and "premature" only emphasize the regulatory whipsaw to which New Unit Developers have been subjected.

Washington Timberlands, LLC is a wholly-owned subsidiary of P4G, and the properties it acquired were acquired on behalf of P4G for the Plant Washington facility. *See* Supplemental Declaration of Dean Alford ¶ 8, attached as Exhibit A. Likewise, while Opponents point to ongoing appeals of P4G's permits and the need for a permit amendment (EPA Resp. at 11, NGOs Resp. at 9), they neglect to mention that the permit amendment is expected to be issued any day, and P4G's settlement agreement with the Sierra Club expressly requires that it dismiss any and all appeals within 10 days of the permit amendment's issuance. *See* Supplemental Alford Declaration ¶¶ 3-4; Settlement Agreement ¶¶ G, I (attached as Exhibit 4 to EPA Resp.). Thus, unlike the MATS rule new-unit standards, the asserted obstacles in no way affect P4G's ability to construct within the time EPA has provided.

**The Holcomb 2 Project**: Opponents assert that the PSD permit for the Holcomb 2 unit has been stayed pending review by the Kansas Supreme Court, and that NEPA review by the Department of Agriculture's "Rural Utilities Service ("RUS") is needed before this project can proceed." EPA Resp. at 9-10; NGOs Resp. at 9. As demonstrated in the attached declarations, however, neither statement is correct: the PSD permit remains valid and presently authorizes construction to commence at any time, and there are other options that would allow Holcomb 2 to move forward without the need for NEPA review. *See* Declaration of Ken Reif ¶¶ 10-14, attached as Exhibit B; Reply Declaration of Wayne E. Penrod ¶¶ 3-5, attached as Exhibit C. Accordingly, neither of the obstacles Opponents rely upon prevents

construction of the Holcomb 2 unit within EPA's one-year window.

**The White Stallion Project**:  Although Opponents claim that other issues prevent financing of the project, none of the asserted obstacles is preventing the construction financing of this project.  Contrary to Opponents' claims, the PSD permit remains valid in spite of the remand, and neither water rights nor the wastewater discharge permit are a barrier to commencing construction.  In short, funding would be available and White Stallion could commence construction but for the inability of equipment vendors to guarantee the new-unit standards can be met. *See* Supplemental Declaration of Frank Rotondi ¶¶ 4-6, attached as Exhibit D.

In the end, Opponents' assertions are an attempt to distract the Court from the issue at hand.  The Court should not deny expedited review—and sound the death knell for New Unit Developers' projects—when it is undisputed that the MATS rule new-unit standards prevent New Unit Developers from commencing construction, and their projects are otherwise moving forward.

### B.    New Unit Developers Have Substantial Claims

New Unit Developers ask the Court to sever and expedite two issues in this proceeding: (1) whether the new-unit standards were, in fact, "achieved in practice" by the source EPA selected as the "best controlled similar source" for each regulated pollutant; and (2) whether EPA erred in setting the new unit standards on a "pollutant-by-pollutant" basis such that the emission standards for new units are based on emissions from different facilities, which EPA determined to be best

controlled similar source for each pollutant, rather than the single "best controlled similar <u>source</u>" as the CAA requires.[8]  New Unit Developers' claims on these issues meet the test of substantiality for expedited consideration.

### 1. The New-Unit Standards Were Not "Achieved In Practice"

EPA is required under the CAA to establish emission standards for new-units that are not "less stringent than the emission control that is achieved in practice by the best controlled similar source."  42 U.S.C. § 7412(d)(3).  This Court has repeatedly explained that to satisfy the "achieved in practice" requirement, EPA must set limits that adequately account for emissions variability such that the source can "meet the … standard every day and under all operating conditions," *Sierra Club v. EPA*, 479 F.3d 875, 881-82 (D.C. Cir. 2007), and it must be achievable " 'under most adverse circumstances which can reasonably be expected to recur.' "  *Sierra Club v. EPA*, 167 F.3d 658, 665 (D.C. Cir. 1999) (quoting *National Lime Ass'n v. EPA*, 627 F.2d 416, 431 n.46 (D.C. Cir. 1980)).

The record in this case conclusively establishes that the new-unit standards do not meet this requirement, and that they were not, in fact, "achieved in practice" by the units EPA selected as the best controlled similar source.  EPA based its new-unit standards for PM and HCl on two different units: Logan 1 for HCl and Chambers for

---

[8] *See* Joint Motion by Developers of New Solid-Fueled Electric Generating Units to Sever and Expedite Consideration of Issues Germane to Hazardous Air Pollutant Standards Applicable to New Units (Doc. 1371309) at 12-18; Notice of Further Clarification and Modification of Relief Requested (Doc. 1373043) at 4-6.

PM.  At the time EPA promulgated these new-unit standards, it had in its possession

at least six sets of stack test data from each of these facilities.  As EPA admits, it

simply ignored the five data sets showing higher emissions, and instead based its new-

unit standards entirely on the single test for each facility with the very lowest value.

*See* EPA Resp. at 17-18.  And while EPA performed a statistical analysis—which was

useless given that the sample size consisted of a single, three-run test (*see* Roberson

Declaration ¶¶ 5-8))—in a purported effort to account for emissions variability, it is

undisputed that the emissions reflected in the five data sets that EPA ignored exceed

the standards set by EPA.  In other words, the Chambers and Logan 1 units failed to

meet EPA's new-unit standards five out of six times.  Given this factual record, it is

simply not credible for EPA to claim, as it does, that these standards were actually

"achieved in practice" as the CAA requires.

    EPA's arguments in response warrant little discussion.[9]  EPA's argument

(Resp. at 13-14) that New Unit Developers' claims are not substantial because the

standard of review is deferential is meritless.  If that were true, no party would ever

have substantial claims in a proceeding reviewing agency action for purposes of

_____

[9] NGOs also attempt to justify EPA's unlawful new-unit standards, but their response adds nothing because they apply the wrong standard.  In evaluating a motion to expedite, New Unit Developers are not required to demonstrate "likelihood of success on the merits" as would be required to obtain a preliminary injunction, only that their claims are "substantial."  *Compare* NGOs Resp. at 15 (arguing that New Unit Developers "are not likely to succeed on the merits"), *with* D.C. Circuit Handbook at 33 (expedited review requires only claims that are "substantial").

expedited consideration or review on the merits. And of course, that is not the case. *See, e.g.*, *Portland Cement Ass'n v. EPA*, No. 10-1358, Order (Doc. 1288812) (granting industry petitioners' motions for expedited review and severance), attached as Exhibit E; *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 186-87 (D.C. Cir. 2011) (vacating EPA rule setting emission standards issued under CAA § 112 for wrongly analyzing the data in its possession).

EPA's argument (Resp. at 17-19) that it could reasonably refuse to consider five out of six sets of test data demonstrating the range of actual emissions variability from the Chambers and Logan 1 units, and that the new-unit standards were achieved in practice simply because the units met them in a single short-term test conducted over a short period of time during uniform operating conditions is equally flawed. This Court's precedents unambiguously hold that a standard is not achieved in practice merely because it was achieved once; rather, it must be achievable 100 percent of the time under the entire range of operating conditions. No better evidence exists that the new-unit standards are legally flawed than the fact that the units EPA selected failed to meet EPA's standards five out of six times.

## 2. EPA's Pollutant-By-Pollutant Approach Cannot Be Applied To New Units

As New Unit Developers explained in their motion, they have a substantial claim that EPA must set emission standards by "source," not by pollutant. 42 U.S.C. § 7412(d)(1), (3). In the new-unit context, the CAA expressly provides that new-unit

limits cannot be less stringent than the level of control achieved by the "best controlled similar <u>source</u>," in the singular rather than the plural. *Id.* § 7412(d)(3). EPA's decision to establish new-unit standards on a "pollutant-by-pollutant" basis violates Congress's command that EPA establish emission limits based on what the best actual source has achieved for the suite of HAPs emitted. This decision has resulted in an amalgam of new-unit standards that are based on multiple sources and that, EPA's protestations notwithstanding, no single unit actually achieved.

EPA's arguments that CAA § 112(d)(3) is ambiguous (Resp. at 14-16) ignores the plain statement in CAA § 112(d)(3) that EPA must base new-unit standards on the emissions profile of the "best controlled similar source," not "sources." Moreover, Congress said nothing about establishing standards based on the level of "control achieved in practice [for each pollutant]." EPA's attempt to rewrite the CAA to say so should be rejected. *Compare id.* § 7412(d)(3) ("best controlled similar source"), *with id.* § 7409(a)(1)(A) (requiring EPA to set standards "for each air pollutant").

Second, EPA's assertion that it would be required to make "value judgments as to which hazardous air pollutants merit greater or lesser controls" because the "best performer in regard to one pollutant may be the worst performer in regard to another" (Resp. at 16) is neither accurate nor supported by any record citation that such is the case here. Moreover, while CAA § 112(d)(3) establishes the MACT floor and requires that new-source limits not be less stringent than what the best controlled similar source actually achieved, *id.* § 7412(d)(3), the CAA specifically allows EPA to

impose additional restrictions at the "beyond-the-floor" stage under CAA § 112(d)(2).

*See Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1235-36 (D.C. Cir. 2004).  At

that stage, EPA could address any anomalous situation, if indeed one exists, where

EPA reasonably concludes, based on the statutory factors, that the "best controlled

similar [*existing*] source" for all pollutants to be regulated does not represent the best

level of emissions controls for those pollutants that a *new* source could achieve.

## II.  Severing the New-Unit Issues and Granting Expedited Review Would Not Frustrate Judicial Economy, and Justice Requires Expedited Review In Any Event

### A.  The Expedited Proceeding Will Resolve All Claims Specific to New Units

Opponents assert that granting New Unit Developers' motion would frustrate

judicial economy because it would leave certain new-unit issues unresolved to be

litigated in the main proceeding, and because certain non-moving petitioners may

challenge EPA's finding that it is "appropriate and necessary" to regulate EGUs under

CAA § 112.  Again, Opponents are incorrect.

As to their first point, this proceeding will resolve <u>all</u> claims that are specific to

the new-unit standards.  New Unit Developers are not reserving any challenges

specific to these standards to be litigated later.  What is more, the only other parties

that are affected by the new-unit standards either support or do not oppose severance.

Of the multitude of petitioners in this case, only three have indicated that their

interest in the new-unit standards is such that they desire to participate in the briefing

of the severed and expedited issues. *See* Resp. of the Utility Air Regulatory Group (Doc. 1374277) at 2; Resp. of Oak Grove Mgmt. Co. and Gulf Coast Lignite Coalition (Doc. 1374288) at 5; Resp. in Support of Chase Power Dev. LLC (Doc. 1374332) at 2.

EPA's assertion (Resp. at 4) that the Court should defer consideration of the new-unit issues until after it has resolved any challenges to EPA's "appropriate and necessary finding" is disingenuous. EPA's claim is not that challenges to the appropriate and necessary finding present "threshold" issues that should be resolved first. Rather, its claim is that all issues related to its MATS rule should be litigated together. While New Unit Developers would certainly support any schedule that resolves this entire proceeding before EPA's one-year deadline expires and with sufficient time for New Unit Developers to account for the Court's ruling in the development of their projects, history and experience with complex cases of this sort teaches that this will not occur. And of course, as Competitors point out, any motion that requested expedited review of all claims in this proceeding would have been "opposed by petitioners and respondents alike." Competitors Resp. at 3. For those reasons, New Unit Developers are seeking expedited review of their narrow set of issues, and it is for precisely those same reasons that the motion should be granted.

## B. The New-Unit Issues Are Discrete and Severable

Both of the issues that New Unit Developers seek to sever and expedite are discrete and relate only to the new-unit standards, and would not prejudice briefing of existing-unit standards. New Unit Developers' "achieved in practice" claim is based

both on a dispute as to statutory interpretation and a dispute as to the arbitrary and capricious manner in which EPA applied the statutory standard in determining the new-unit standards. The statutory interpretation claim is based on the "achieved in practice" language in CAA § 112(d)(3) that applies only to the establishment of new-unit standards. The arbitrary and capricious claim applies to EPA's selection of what it believed to be the best controlled similar sources for the establishment of the new-unit standards and EPA's refusal to take into consideration available test data for these units. This arbitrary and capricious claim in no way overlaps with issues that may be raised as to existing units.

Similarly, New Unit Developers' "pollutant-by-pollutant" argument applies discretely to the new-unit standards. The argument is based on the specific language of the first sentence of CAA § 112(d)(3), which EPA interpreted as authorizing what New Unit Developers believe is an improper pollutant-by-pollutant approach to setting the new-unit standards. Although EPA interpreted the second sentence of CAA § 112(d)(3) and CAA § 112(d)(3)(A) and (B), which apply to the establishment of existing-unit standards, as also authorizing a pollutant-by-pollutant approach, New Unit Developers do not intend to rely on that language or to challenge the method by which EPA established existing-unit standards.

### C.  No Party Will Be Prejudiced By Severance and Expedition

As is explained above, all parties with a direct interest in the new-unit standards either support or do not oppose severance and will participate in any briefing of the

severed issues.  Competitors' vague assertions of prejudice resulting from New Unit

Developers' motion amount to little more than the contention that parties that have

voluntarily elected to intervene as respondents in this proceeding might decide to

participate in the briefing of the severed issues as well.  A decision by certain

intervenors to file a brief to defend EPA's actions as to new units is not prejudice to

them, and any perceived burden these intervenors might face from additional work is

one that they have taken upon themselves and is trivial when compared to the threat

the MATS rule new-unit standards pose to New Unit Developers' businesses.

### D. Justice Requires Expedited Review

Finally, even if Opponents were correct that expediting the new-unit issues

would add some level of complexity to this proceeding, this is no reason to deny

expedited review.  "[J]ustice, not judicial economy, is the first principle of our legal

system," *United States v. Crane*, 499 F.2d 1385, 1388 (6th Cir. 1974), and " '[n]otions of

judicial economy' " must " 'give way to fairness' " in appropriate cases, *Rudell v.

Comprehensive Accounting Corp.*, 802 F.2d 926, 928 (7th Cir. 1986) (quoting *Martino v.

McDonald's Sys., Inc.*, 598 F.2d 1079, 1085 (7th Cir. 1979)).  This is particularly true

where, as here, any minimal additional complexity resulting from severance and

expedited review on the one hand is far outweighed by "the danger of denying justice

by delay on the other."  *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511

(1950).  Severance and expedited review should be granted.

Respectfully submitted,

/s/ Patricia T. Barmeyer
Patricia T. Barmeyer
Les Oakes
John L. Fortuna
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
404.572.3563 telephone
404.572.5136 facsimile
pbarmeyer@kslaw.com

Counsel for
Power4Georgians, LLC


/s/ Eric Groten
Eric Groten
Vinson & Elkins LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568
(512) 542-8709

Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
(202) 639-6507

Counsel for
White Stallion Energy Center, LLC

Dated:   June 1, 2012

/s/ Peter S. Glaser
Peter S. Glaser
George Y. Sugiyama
Michael H. Higgins
Troutman Sanders LLP
401 Ninth Street N.W.
Suite 1000
Washington, D.C. 20001
202.274.2998 telephone
202.654.5611 facsimile
peter.glaser@troutmansanders.com

Counsel for
Tenaska Trailblazer Partners, LLC
Deseret Power Electric Cooperative
Sunflower Electric Power Corporation


/s/ Jeffrey R. Holmstead
Jeffrey R. Holmstead
Bracewell & Giuliani LLP
2000 K Street, NW
Suite 500
Washington, DC 20006-1872
202.828.5852 telephone
202.857.4812 facsimile
jeff.holmstead@bgllp.com

Counsel for
Tri-State Generation and Transmission
Association, Inc.

## CERTIFICATE OF SERVICE

I certify that on this 1st day of June, 2012, a copy of the foregoing *New Unit Developers' Consolidated Reply in Support of Joint Motion by Developers of New Solid-Fueled Electric Generating Units to Sever and Expedite Consideration of Issues Germane to Hazardous Pollutant Standards Applicable to New Units (Corrected)* was served electronically through the Court's CM/ECF system on all registered counsel.

<u>/s/ John L. Fortuna</u>

# EXHIBIT A

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

POWER4GEORGIANS, LLC,

               Petitioner,

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

               Respondent.

No. 12-1184
(consolidated with No. 12-1100)

---

**SUPPLEMENTAL DECLARATION OF C. DEAN ALFORD, PROJECT
MANAGER FOR PLANT WASHINGTON AND POWER4GEORGIANS,
LLC**

I, C. Dean Alford, do hereby declare, under penalty of perjury pursuant to 28
U.S.C. § 1746, as follows:

1.     My name is Dean Alford.  I am over 21 years of age, under no legal
disability, and competent and authorized to make this Declaration.  The facts stated
in this Supplemental Declaration are true and correct based on my personal
knowledge.  I give this Supplemental Declaration voluntarily in further support of
the Joint Motion by Developers of New Solid-Fueled Electric Generating Units to
Sever and Expedite Consideration of Issues Germane to Hazardous Air Pollutant
Standards Applicable to New Units ("Joint Motion to Sever and Expedite") in the
above-styled case, to address and clarify certain factual matters raised in briefs

opposing the Joint Motion to Sever and Expedite, and for any other lawful purpose.

2.    The briefs in opposition to the Joint Motion to Sever and Expedite include a number of incorrect and incomplete statements concerning the Plant Washington project of Power4Georgians ("P4G").  None of these statements changes the correctness of the statement in Paragraph 5 of my earlier Declaration that "as of April 9, 2012, P4G has a final PSD permit and all other required permit approvals necessary to commence construction of Plant Washington."    Nor do they affect my conclusion, which I reaffirm here, that "P4G's $30 million expenditure and years of work are directly jeopardized" by EPA's MATS Rule and its parallel "GHG NSPS" rulemaking establishing new source performance standards for greenhouse gases.

3.    For example, Respondent EPA's Opposition brief asserts that "state administrative challenges to the P4G permit remain pending," and "that administrative litigation will not be dismissed unless and until P4G applies for and obtains a permit amendment…."  While there is administrative litigation pending, such proceedings do not affect the completeness and finality of the PSD Permit, which was affirmed by the Office of State Administrative Hearings on April 9. The fact that the final decision affirming the PSD permit has been appealed to Superior Court does not alter the fact that the PSD permit is final, unless and until

reversed or remanded by the Superior Court or an appellate court. There is pending, in addition, an administrative challenge to an amendment to the P4G air permit, which is a case-by-case MACT determination. The lack of finality of the case-by-case MACT determination does not affect the PSD permit.

4. Moreover, unlike the MATS Rule, these administrative appeals in no way impair P4G's ability to commence construction of the Plant Washington facility before expiration of the one-year deadline EPA imposed in the GHG NSPS. Contrary to EPA's assertions, all administrative and judicial proceedings concerning P4G's air quality permits are scheduled to be resolved shortly pursuant to the terms of a recent Settlement Agreement between P4G and the petitioners in the administrative litigation (a copy of which was attached as Exhibit 4 to EPA's Opposition brief). P4G has applied for the permit amendment contemplated by the Settlement Agreement; the Georgia Environmental Protection Division ("Georgia EPD") has published the draft permit amendment for comment; the comment period for the permit closed on May 18, 2012; and P4G expects Georgia EPD to issue the permit amendment in the very near future. Once this permit amendment is issued, the Settlement Agreement expressly obligates the petitioners in the administrative litigation to dismiss the litigation concerning the PSD permit and the case-by-case MACT determination within 10 days.

5.     As part of the settlement, P4G agreed to a permit amendment requiring

P4G to comply with 40 C.F.R., Subpart UUUUU, at start-up, rather than having

the date of compliance governed by the rule that provides that compliance must be

"as expeditiously as practicable" but in no event later than eight years after

promulgation of the MATS Rule on February 16, 2012.

6.     P4G was willing to agree to comply with Subpart UUUUU at the time

of start-up because:  1) given that the Plant Washington facility has not yet been

finally designed, engineered and contracted for, it would have been difficult, if not

impossible, to persuade Georgia EPD that compliance at a time after start-up

would be "as soon as practicable"; 2) given those same facts, and the long lead

time required to design, finance and construct a $2 billion power plant, there would

be little time difference between the date of start-up and March 2020; and 3)

because Plant Washington will be required to comply with Subpart UUUUU,

either at start-up or not long thereafter, and for the next 20 years or more, the

facility will have to be designed to meet those standards.

7.     The decision by P4G to seek the permit amendment requiring

compliance with Subpart UUUUU upon start-up does not constitute an

acknowledgement that the MATS standards as promulgated in the Final Rule are

reasonable, that they can be achieved in practice, or that vendors will provide

guarantees that those standards can be met.  Rather, the decision to seek that permit

amendment reflects the fact that P4G will be required to comply with Subpart UUUUU, whatever that standard finally requires. As evidenced by P4G's petition for review of the Final Rule and the Joint Motion, P4G believes the current rule is severely flawed and is taking legal action to seek to have the rule reversed and vacated. With the significant flaws in the MATS Rule that have been identified, I am optimistic that P4G and the other new sources will obtain significant relief from the unreasonably stringent standards for new units that EPA has promulgated. In the final analysis, however, P4G will have to comply with the standards, and will have to satisfy itself and its investors that it can comply with the standards, or the facility cannot be built. At the present time vendors of the required pollution control equipment have said they will not provide guarantees that the standards set by EPA can be met, which puts the Plant Washington project at risk because such guarantees are a required precondition to obtaining financing for the Plant Washington project.

8. Sierra Club and the other NGOs that have opposed the New Unit Motion to Sever and Expedite are not well-informed about many aspects of the Plant Washington project and there are numerous statements in the Declaration of Kurt Ebersbach about P4G's Plant Washington project that are incorrect. For example, the NGOs assert that P4G has not acquired the property on which the facility is to be built, and in support they have submitted several deeds into

Washington Timberlands, LLC. The NGOs are apparently not aware that Washington Timberlands, LLC is a wholly-owned subsidiary of P4G and that the properties acquired by Washington Timberlands, LLC were acquired on behalf of P4G and for the Plant Washington facility.

9.     In sum, based on my experience, both with the Plant Washington project and in the energy development sector generally, EPA's decision to issue the Proposed GHG NSPS and the MATS Rule concurrently has placed P4G in an untenable regulatory position, which jeopardizes P4G's more than $30 million investment in and the very viability of the Plant Washington project. But for the Catch-22 created by the MATS Rule and the one-year deadline to commence construction imposed by the GHG NSPS, P4G would be able to seek and obtain the financing needed to construct the Plant Washington facility. Accordingly, to avoid the risks to P4G that EPA has alone created, P4G asks this Court to expedite the briefing and consideration of its Petition for Review.

_____
C. Dean Alford

Dated: May 30, 2012

# EXHIBIT B

**Declaration of Ken Reif**
**Senior Vice President and General Counsel**
**Tri-State Generation & Transmission Association, Inc.**

**In Support of Joint Motion by Developers of New Coal-Fueled Electric**
**Generating Units to Sever and Expedite Consideration of Issues Germane to**
**Hazardous Air Pollutant Standards Applicable to New Units**

Ken Reif, being first duly sworn upon oath, deposes and says:

1.     I am the Senior Vice President and General Counsel of Tri-State Generation & Transmission Association, Inc. ("Tri-State") and serve in the role of Chief Legal Officer.  I have served in this capacity since I joined Tri-State in November 2004.

2.     I make this declaration in support of the Joint Motion referenced above. I have personal knowledge of the issues and activities referred to herein. If called upon to testify, I could and would testify truthfully thereto.

3.     Tri-State is a wholesale electric power supply cooperative providing electric power on a not-for-profit basis to 44 member distribution systems that serve customers in a 250,000 square-mile territory including New Mexico, Colorado, Nebraska, and Wyoming.  Among other things, Tri-State owns and/or operates coal-fired electric generating units in four states.

4.     As discussed in the April 27, 2012, Declaration from Tri-State's General Manager, Kenneth J. Anderson (the "Anderson Declaration"), Tri-State has also entered into an agreement with Sunflower Electric Power Corporation ("Sunflower") to develop a new coal-fired electric generating unit at a facility located in Holcomb, Kansas.  This power plant is generally referred to as Holcomb 2.  Sunflower began initial development work on this plant more than 7 years ago, and Tri-State and Sunflower have worked together on this project for almost 5

years.  Tri-State alone has already invested approximately $70 million in developing this plant.

5.      In order to finance any such project, a developer must submit guarantees from its equipment suppliers stating that their equipment will be able to meet all required emissions limitations.

6.      In February 2012, EPA issued a rule (known as the "MATS Rule") that imposes additional emissions limitations for new sources (like Holcomb 2) that we believe are unlawful under the Clean Air Act.

7.      Years before the MATS Rule was issued, Tri-State and Sunflower engaged some of the world's leading experts to design and provide state-of-the-art pollution equipment for Holcomb 2, but they have informed us that they cannot guarantee that their equipment will comply with the MATS limitations for new sources.  Without satisfactory performance guarantees, Tri-State will not be able to obtain the financing necessary to move forward with Holcomb 2.

8.      We believe the Court will likely find the MATS limitations for new sources to be unlawful.  Such a finding would eliminate this impediment to Holcomb 2 and allow construction on the plant to begin.  Tri-State is very concerned, however, that this finding will come too late for Holcomb 2 because of another recent EPA action – a notice proposing to adopt New Source Performance Standards for Greenhouse Gas emissions for New Fossil Fuel-fired Electric Generating Units.  77 Fed. Reg. 22,392 (Apr. 13, 2012) (the "NSPS").

9.      EPA took this action under a provision of the Clean Air Act that makes the *proposed* rule immediately binding on any source that is not already under construction by the time the proposal is published, unless it is subsequently changed or overturned by EPA, Congress, or the courts.  See 42 U.S.C. 7411(a)(2) and (b)(4).  Construction is not yet underway at Holcomb 2.  Thus, under current law (as discussed in the Anderson Declaration and in the Joint Motion referenced

above), the NSPS will kill Holcomb 2 unless Tri-State and/or Sunflower can commence construction on it by April 12, 2013.  It is for this reason that Tri-State and other new unit developers have asked the Court to sever and expedite two issues that are specific to the standards for new sources.

10.     In responding to this Motion, EPA and other parties supporting EPA in this case argue that there is no reason to expedite the new source issues because there are other impediments, in addition to the MATS Rule, that stand in the way of commencing construction on Holcomb 2.  They suggest that, even if the Court strikes down the MATS limitations for new sources, there are two other things that will prevent Holcomb 2 from moving forward by April 12, 2013:  (1) ongoing litigation over the PSD permit for Holcomb 2 and (2) a district court decision holding that the Rural Electric Service ("RUS") should have prepared an Environmental Impact Statement under the National Environmental Policy Act ("NEPA") before taking certain actions related to Holcomb 2.   As explained below, these suggestions are simply incorrect.

11.     It is true that there is ongoing litigation over the PSD permit and that the district court's NEPA decision may affect the development strategy that Tri-State and Sunflower are currently pursuing, but neither of these things prevent the commencement of construction on Holcomb 2 at this time.

12.     Although the PSD permit has been challenged, it is still a valid permit and remains in full force and effect.  In their opposition (on page 9), Movant-Intervenors assert, incorrectly, that the Holcomb 2 permit has been stayed. Response of Movant-Intervenors American Academy of Pediatrics et al. in Opposition to Joint Motion to Sever and Expedite (the "Environmental Opposition").  The permitting authority in Kansas, the Kansas Department of Health and the Environment, did issue a stay of the 18 month deadline in the permit, but the rest of the permit remains in effect.  *In re: Sunflower Electric Power*

*Corp.*, No 11-E-80-BOA (Order Granting Application for Stay, May 24, 2011). I have been advised by outside counsel that the permit remains in effect and authorizes construction on Holcomb 2 to commence at any time.

13.    Movant-Intervenors also claim, again incorrectly, that "The Holcomb 2 project requires review under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., which has not yet begun." Environmental Opposition at 9. This is not what the district court said in its decision. *Sierra Club v. USDA*, No. 07-1860 (D.D.C. Jan. 31, 2012). It held that certain RUS actions require NEPA review and that future RUS approvals related to Holcomb 2 must comply with the NEPA requirements included in RUS regulations, as interpreted by the court. This decision has been appealed, but it does not require that NEPA review be completed before construction on Holcomb 2 can commence. If the district court decision is upheld on appeal, there are options that would allow Holcomb 2 to commence construction without the need for NEPA review. Although such options may not be ideal, they are legally available.

14.    If this Court, before the end of 2012, issues a decision on the new source MATS standards that is favorable to Tri-State, it will be possible to commence construction on Holcomb 2 by April 12, 2013. As stated in the Anderson Declaration, the new source standards in the MATS Rule are the only legal impediments to commencing construction on Holcomb by the April 12th deadline.

Ken Reif
Senior Vice President and General Counsel
Tri-State Generation & Transmission Assoc., Inc.
1100 West 116th Avenue
Westminster, CO  80234

# EXHIBIT C

**Reply Declaration of Wayne E. Penrod**

**Executive Manager, Environmental Policy,**

**SUNFLOWER ELECTRIC POWER CORPORATION**

**IN SUPPORT OF MOTION FOR EXPEDITED REVIEW**

1.      I am the Executive Manager, Environmental Policy, for Sunflower

Electric Power Corporation (Sunflower) and serve in a similar capacity for Mid-

Kansas Electric Company, LLC, both of which are located in western Kansas. I

previously submitted a declaration in this proceeding. As set forth in my declaration,

Sunflower is developing a new coal-fueled electric generating unit in western Kansas

known as the Holcomb 2 unit.

2.      The purpose of my reply declaration is to respond to statements by the

Environment Protection Agency (EPA) and other parties opposing the motion by the

developers of new solid-fuel electric generating units to sever issues germane to the

MATS rule new-unit standards and to expedite consideration of those issues. These

parties assert that Sunflower will not be injured if the Court declines to require

expedited consideration because, in their view, the Holcomb 2 unit faces other

barriers to construction.

3.      The first barrier cited is that the Holcomb 2 PSD Construction Permit is

currently on appeal before the Kansas Supreme Court. The permit was issued by the

Kansas Department of Health and the Environment (KDHE), and Sierra Club has

filed an appeal which is currently pending. However, the permit itself was not stayed

by the Court so, but for the MATS rule constraint at issue here, Sunflower could proceed with construction. [1]

4. The second barrier cited by EPA is the judicial decision by the United States District Court for the District of Columbia which determined that Rural Utility Services (RUS) violated the National Environmental Policy Act of 1969 ("NEPA") by failing to produce an environmental impact statement in connection with previous RUS' approvals of the Holcomb 2 project. In this decision the judge requires that any future RUS approvals related to the Holcomb 2 project conform to the NEPA requirements as set forth in RUS regulations. There are currently no such approvals pending before the RUS and no further approvals may be necessary.

5. Clearly, neither of the "barriers" cited by the opponents can fairly be said to prevent the Holcomb 2 project from proceeding to construction. However, the impact of the MATS rule on new developers is not avoidable. But for the EPA MATS rulemaking, a number of concurrent elements of front end engineering and design process could be undertaken for the plant.[2] Indeed, the developer's ongoing effort to evaluate and select a vendor for the air quality control systems has been thwarted by the impact of the MATS rule.

---

[1] KDHE has stayed only the 18-month deadline for commencing construction.

[2] These include, among others, a determination of the appropriate air pollution control technology to be deployed, a determination of performance guarantees not yet able to be proffered by vendors of such technology, and undertaking the financing of the unit proposed, all of which are currently stymied by the MATS rule.

I, Wayne E. Penrod, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 30, 2012

*Wayne E. Penrod*
Wayne E. Penrod (May 30, 2012)
_____

Wayne E. Penrod
Executive Manager, Environmental Policy
Sunflower Electric Power Corporation

# EXHIBIT D

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| WHITE STALLION ENERGY CENTER, LLC<br><br>    Petitioner,<br><br>  v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>    Respondent. | No. 12-1100 (and consolidated cases) |

## SUPPLEMENTAL DECLARATION OF FRANK ROTONDI, PRESIDENT OF WHITE STALLION ENERGY CENTER, LLC

I, Frank Rotondi, swear or affirm under penalty of perjury the following:

1.    I am President of White Stallion Energy Center, LLC ("WSEC"), Petitioner in the above-captioned case, and I have firsthand knowledge of the facts set forth herein.  I am over the age of twenty-one (21) and I am competent to make this declaration.

2.    I have seen the following claims made about the White Stallion Energy Center ("WSEC") in the responses filed in opposition to the "Joint Motion by Developers of New Solid-Fueled Electric Generating Units to Sever and Expedite

Consideration of Issues Germane to Hazardous Air Pollutants Standards Applicable to New Units":

(a)     That White Stallion submitted "a declaration referencing that a construction permit for this facility was issued on December 16, 2010. Mot. Ex. I ¶¶ 7, 9-11, 14. That declaration, however, fails to note that subsequently, the issued permit was challenged in Texas district court and remanded by that court on June 20, 2011, to the issuing agency for the taking of additional evidence. See June 20, 2011 Order, EPA Ex. 1. The outcome and timing of resolution of further state administrative and judicial proceedings is uncertain." (EPA Response, at p.10);

(b)     That "White Stallion has not yet acquired the water rights its project requires, or necessary wastewater permits." (American Academy of Pediatrics, et al. Response, at p 9).

3.     Those claims are made at least in part to support the proposition that barriers other than the new source standards challenged in this case are preventing the commencement of construction of the White Stallion Energy Center. These claims, however, are irrelevant to my conclusion, as stated in my prior declaration in this case, that "if those standards are vacated or revised to a level demonstrated to be achievable by currently-existing technology, I believe WSEC would be able to secure the needed financing. In fact, WSEC currently has commitments for financing from AAA-rated funds that are contingent on equipment performance being guaranteed under the emission levels established in the Air Permit as case-by-case MACT."

4.     The remand ordered by the district court in no way invalidates the air permit, which remains in effect as a valid authorization of construction activity while

2

various legal claims are resolved. The marketplace understands that air permits for solid-fueled power plants will be subject to legal challenges by many organizations dedicated to stopping such projects everywhere, often with funding from business competitors, and often persisting even after the project is built; accordingly, the pendency of challenges to the air permit is not a barrier to construction financing.

5. The WSEC has secured substantially all of the water it needs, and multiple options are available for the remainder; accordingly, water supply is not a barrier to construction financing.

6. The wastewater discharge permit referenced in the American Academy of Pediatrics, et al. Response similarly is irrelevant to my conclusions about the financing of the project: This permit is not needed before construction commences, and the financial community is confident it will be issued.

I declare under penalty of perjury that the above is true and correct.

Executed on May 29, 2012.

Frank Rotondi

# EXHIBIT E

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 10-1358                                September Term 2010

**EPA-75FR54970**

**Filed On:** January 19, 2011

Portland Cement Association,

       Petitioner

   v.

Environmental Protection Agency and Lisa
Perez Jackson,

       Respondents

--------------------------------

North Carolina Coastal Federation, et al.,
          Intervenors

--------------------------------

Consolidated with 10-1363, 10-1366, 10-1367,
10-1369, 10-1373, 10-1374, 10-1376, 10-1379

_____

**No.  10-1359**

Portland Cement Association,

       Petitioner

   v.

Environmental Protection Agency and Lisa
Perez Jackson,

       Respondents

--------------------------------

North Carolina Coastal Federation, et al.,
          Intervenors

--------------------------------

Consolidated with 10-1364, 10-1365, 10-1368,
10-1370, 10-1371, 10-1372, 10-1375, 10-1378

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 10-1358**                                    **September Term 2010**

_____

**No. 10-1361**

Lehigh Cement Company,

               Petitioner

       v.

Environmental Protection Agency,

               Respondent
------------------------------
Sierra Club, et al.,
               Intervenors
------------------------------
Consolidated with 10-1377

      **BEFORE:**   Ginsburg, Rogers, and Griffith, Circuit Judges

### O R D E R

      Upon consideration of Industry Petitioners' motion to expedite, the oppositions thereto, the reply, and the motion to expedite consideration of the motion to expedite; Tile Council of North America, Inc.'s motion to sever and consolidate; Lehigh Cement Company's motion to sever and consolidate, the opposition thereto, and the reply; Environmental Petitioners' cross-motion to sever and the opposition thereto; and the Environmental Protection Agency's motion to consolidate and to hold in abeyance, the oppositions thereto, and the reply, it is

      **ORDERED** that Industry Petitioners' motion to expedite be granted.  It is

      **FURTHER ORDERED** that Industry Petitioners' motion to expedite the motion to expedite be dismissed as moot.  It is

      **FURTHER ORDERED** that Tile Council of North America, Inc.'s motion to sever and consolidate be granted.  Accordingly, No. 10-1377 is severed from No. 10-1361, et al.  The Clerk is directed to consolidate No. 10-1377 with No. 10-1359, et al.  It is

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 10-1358**                          **September Term 2010**

**FURTHER ORDERED** that Lehigh Cement Company's motion to sever and consolidate be granted.  The Clerk is directed to sever from No. 10-1361 Lehigh Cement Company's claims challenging the New Source Performance Standards and assign them new docket, No. 11-1012, Lehigh Cement Company v. EPA.  The Clerk is directed to consolidate No. 11-1012 with 10-1358, et al.  The Clerk is further directed to consolidate No. 10-1361 with No. 10-1359, et al.  It is

**FURTHER ORDERED** that Environmental Petitioners' cross-motion to sever be denied.  It is

**FURTHER ORDERED** that the Environmental Protection Agency's motion to consolidate and to hold in abeyance be denied.  It is

**FURTHER ORDERED** that No. 10-1358, et al. be scheduled for oral argument on the same day and before the same panel as No. 10-1359, et al.  It is

**FURTHER ORDERED** that the parties and amici curiae submit, by February 22, 2011, proposed formats for the briefing of these cases.  The parties and amici curiae are strongly urged to submit a joint proposal and are reminded that the court looks with extreme disfavor on repetitious submissions and will, where appropriate, require a joint brief of aligned parties and amici curiae with total words not to exceed the standard allotment for a single brief.  The parties and amici curiae are directed to provide detailed justifications for any request to file separate briefs or to exceed in the aggregate the standard word allotment.  Requests to exceed the standard word allotment must specify the word allotment necessary for each issue.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Laura Chipley
Deputy Clerk